Stephen B. Coleman (State Bar #021715)
**PIERCE COLEMAN PLLC**
7730 East Greenway Road, Suite 105
Scottsdale, AZ 85260
Tel. (602) 772-5506
Fax (877) 772-1025
Steve@PierceColeman.com
*Attorneys for Defendants*

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| Juan Hernandez, individually and the Arizona Conference of Police and Sheriffs, an Arizona nonprofit corporation,<br><br>  Plaintiffs,<br><br>  v.<br><br>The City of Phoenix, a municipal corporation; Jeri Williams, in her official capacity as Chief of Police of the Phoenix Police Department; and Shane Disotell, in his official capacity as the Commander of the Phoenix Police Professional Standards Bureau,<br><br>  Defendants. | Case No: CV-19-05365-PHX-MTL |

**DEFENDANTS' OPPOSITION TO PLAINTIFFS'
AMENDED MOTION FOR A PRELIMINARY INJUNCTION**

Defendants City of Phoenix (the "City), Chief of Police Jeri Williams, and Commander Shane Disotell (collectively "Defendants") submit the following Opposition to Plaintiffs' Amended Motion for a Preliminary Injunction (the "Motion").

**FACTUAL BACKGROUND**

Plaintiff Juan Hernandez ("Hernandez") is a Sergeant with the Phoenix Police Department ("Police Department"). He faces potential discipline based on inflammatory Facebook posts that demonstrate religious bigotry and violate departmental policies.

Hernandez's postings were publicized by the Plain View Project ("PVP"), a group that screens the social media postings of police officers for content that may undermine the community's trust and confidence in law enforcement.  On or about June 1, 2019, the PVP released a collection of social media posts by Phoenix police officers to the public and media outlets, including several postings by Hernandez that reflected anti-Muslim sentiment.  [Complaint at ¶¶ 26, 28]  This resulted in a wide array of negative publicity for the Police Department which included news stories with the following headlines:

- June 3, 2019, "Phoenix officers exposed for racist, violent Facebook posts" https:/www.abc15.com;
- June 3, 2019, "Phoenix Cops Bash Muslims, Immigrants, and Black People Online…" https://www.phoenixnewtimes.com;
- June 4, 2019, "Phoenix Police investigating 'embarrassing and disturbing' posts…" https://www.12news.com; and
- June 5, 2019, "Plain View Project brings police under fire for 'shameful' web posts" https://www.azcentral.com.

[Exhibit 20 to Complaint at p. 2]

On June 3, 2019, the Police Department's Professional Standards Bureau ("PSB") initiated an internal investigation of Hernandez's conduct.  The investigation revealed that Hernandez posted religiously insensitive material on Facebook on four occasions.

First, on September 30, 2013, Hernandez posted a picture with the following statement:  "THE MOST COMMON NAME FOR A CONVICTED GANG RAPIST IN ENGLAND IS. . .  Muhammad  Note to the British media – these gangs are not comprised of 'Asians'; they are Muslims."  [Exhibit 4 to Complaint]  Second, on October 8, 2014,

1

Hernandez posted a joke about a taxi driver who kicked a Muslim passenger out of his vehicle and told him. "In the time of the prophet, there were no taxis, so piss-off and wait for a camel!"  [Exhibit 5 to Complaint]  Third, on December 24, 2013, Hernandez posted material ridiculing Islamic contributions to science.  [Exhibit 6 to Complaint]  Fourth, on January 9, 2014, Hernandez posted an article entitled "Military Pensions Cut, Muslim Mortgages Paid by US!"  [Exhibit 10 to Complaint]

In the course of the investigation, Hernandez acknowledged that his Facebook account was publicly accessible at the time of the postings.  [Exhibit 20 at p. 3] Hernandez also conceded that his Facebook account included pictures of him in his police uniform, such that he was identifiable as a Phoenix police officer.   [*Id.*]

The PSB investigation concluded that Hernandez's postings violated the following departmental policies:

- Operations Order 3.27.9.B.(6), (New 08/13), which states, "Department personnel are free to express themselves as private citizens on social media sites to the degree that their speech does not impair working relationships of this Department, are detrimental to the mission and functions of the Department, that undermine respect or public confidence in the Department, cause embarrassment to the Department or City, discredit the Department or City, or undermine the goals and mission of the Department or City."

- Operations Order 1.1.2.B.(3), which states, "Responsibility and Respect: We respect and honor the inherent dignity of all people, including ourselves, and pledge fair and equal treatment for all."

[*Id.* at pp. 8-9] The PSB determined that Hernandez's conduct was a Class III violation, which may result in a demotion, and/or 40, 80, or 240-hour suspension, or termination of employment. [*Id.* at p. 9] For the next step in the disciplinary process, the matter will be referred to the Police Department's Disciplinary Review Board, which is charged with making a disciplinary recommendation to the Chief of Police. [Complaint at ¶ 51]

Hernandez is now attempting to avoid discipline for his inappropriate conduct by asking this Court to enjoin the enforcement of the Police Department's social media policy.  As set forth in detail below, Hernandez's efforts are unavailing because (1) the social media policy comports with constitutional requirements; (2) most, if not all, of Hernandez's speech was not on a matter of public concern; (3) the City's interest in

2

regulating hateful, bigoted speech by a police officer outweighs any alleged protection under the First Amendment; (4) Hernandez's conduct has undeniably caused discredit to the Police Department; (5) Hernandez has not identified any irreparable harm; and (6) the balance of harm favors the City. Accordingly, the Court should reject Hernandez's attempt to circumvent the disciplinary process to avoid accountability for his actions.[1]

## MEMORANDUM OF POINTS AND AUTHORITIES

A request for injunctive relief must be denied unless a plaintiff can establish the following: "(1) a strong likelihood of success on the merits, (2) the possibility of irreparable injury to plaintiff if preliminary relief is not granted, (3) a balance of hardships favoring the plaintiff, and (4) advancement of the public interest." *Nouveau Riche Corp. v. Tree*, No. CV08-1627-PHX-JAT, 2008 WL 5381513, at *4 (D. Ariz. Dec. 23, 2008). A preliminary injunction "is an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion." *Id.*

**I.    PLAINTIFFS CANNOT SHOW A STRONG LIKELIHOOD OF SUCCESS.**

Hernandez and the Arizona Conference of Police and Sheriffs ("AZCOPS" and collectively, "Plaintiffs") raise two challenges to the Police Department's social media policy. First, they contest the constitutionality of the policy as applied to Hernandez's Facebook postings. Second, they assert that certain portions of the "PERSONAL USE" section of the policy are facially overbroad. The City will analyze each theory separately.

**A.    Hernandez Cannot Prevail On His "As Applied" Claim.**

In the Ninth Circuit, courts evaluate "as applied" First Amendment claims using the following five-step inquiry: (1) whether the plaintiff spoke on a matter of public concern; (2) whether the plaintiff spoke as a private citizen or public employee; (3) whether the plaintiff's protected speech was a substantial or motivating factor in the adverse employment action; (4) whether the state had an adequate justification for treating the employee differently from other members of the general public; and (5) whether the

---

[1] On October 11, 2019, the City agreed to postpone the disciplinary meeting as to Hernandez until this Court rules on the request for a preliminary injunction. [*See* Doc. 11]

state would have taken the adverse employment action even absent the protected speech. *Eng v. Cooley*, 552 F.3d 1062, 1070 (9th Cir. 2009).

### 1. Hernandez Is Unlikely To Succeed On The "Public Concern" Prong.

As an initial flaw with the "as applied" challenge, it is questionable whether Hernandez engaged in protected speech on a matter of public concern. By illustration, the joke that Hernandez posted on October 8, 2014 did not contain any discussion of matters of social or political importance, but rather mocked and ridiculed people of Islamic faith by suggesting that a Muslim should ride a camel because there were no taxis in the time of the prophet. This can hardly be construed as speech on a subject of importance to the community. *See Sabatini v. Las Vegas Metro. Police Dep't*, 369 F. Supp. 3d 1066, 1084 (D. Nev. 2019) (cartoon showing a person amused at a suicide attempt was "merely a crass attempt at humor" and not speech on a matter of public concern). Hernandez's post mocking Muslim contributions to science is likewise lacking in a discernable political or social message. Instead, Hernandez's speech, once again, appears intended to denigrate people of Islamic faith. Similarly, the post identifying Muhammad as the most common name of a gang rapist in the UK serves to perpetuate a negative view of Muslims, rather than foster discourse on issues of public significance.[2]

Hernandez's posting of an article entitled "Military Pensions Cut, Muslim Mortgages Paid by US!" may touch peripherally upon matters of public concern. But even so, this appears to be an attempt by Hernandez to foment discord between veterans (who make up a large percentage of the police force) and Muslims. When viewed in this context, any alleged value is diminished.

At most, Hernandez's collective speech involves an amalgamation of largely unprotected mockery of Muslims and perhaps a single marginally protected post. Thus, on the whole, Hernandez has failed to demonstrate that he has a strong likelihood of success with regard to the "public concern" prong.

---

[2] While Hernandez now attempts to link the Muhammad post to newsworthy events, the Court must look to what "employees actually said, not what they say they said after the fact." *Desrochers v. City of San Bernardino*, 572 F.3d 703, 711 (9th Cir. 2009).

4

**2.     The *Pickering* Balance Weighs Heavily In Favor Of The City.**

Significantly, the Court need not resolve the question of whether Hernandez's speech touched on a matter public concern for the City to prevail. Regardless of how Hernandez's postings are construed, there can be no debate that the Police Department's interest in maintaining order and harmony outweighed any minimally protected interest Hernandez may have had in posting derogatory content targeted at Muslims.

It is well-settled that government employers are empowered to regulate speech that is disruptive to the management of personnel and internal affairs. *See, e.g., Connick v. Myers*, 461 U.S. 138, 146-148 (1983). Thus, as part of the analysis of a First Amendment claim, courts must perform a balancing test to determine whether the interest of the government employer "in promoting the efficiency of the public services it performs through its employees" outweighs the employee's interests, as a citizen, "in commenting upon matters of public concern." *Pickering v. Bd. of Educ.*, 391 U.S. 563, 568 (1968). Relevant considerations in this balancing test are "whether the statement impairs discipline by superiors or harmony among co-workers, has a detrimental impact on close working relationships for which personal loyalty and confidence are necessary, or impedes the performance of the speaker's duties or interferes with the regular operation of the enterprise." *Rankin v. McPherson*, 483 U.S. 378, 388 (1987); s*ee also Brewster v. Board of Educ.*, 149 F.3d 971, 979 (9th Cir. 1998) ("[C]ourts must give government employers wide discretion and control over the management of [their] personnel and internal affairs. This includes the prerogative to remove employees whose conduct hinders efficient operation and to do so with dispatch."). The *Pickering* balance is a question of law to be resolved by the Court. *Connick*, 461 U.S. a 148 n.7 (1983).

When applying the *Pickering* balance, courts give substantial deference to a governmental entity's judgment in making personnel decisions concerning police officers. *See, e.g., Aguilera v. Baca*, 510 F.3d 1161, 1171 (9th Cir. 2007) (police "are entitled to deference, within reason, in the execution of policies and administrative practices that are

1  designed to preserve and maintain security, confidentiality, internal order, and esprit de
2  corps among their employees."); *Cochran v. City of Los Angeles*, 222 F.3d 1195, 1201
3  (9th Cir. 2000) ("Discipline and esprit de corps are vital to [police department's]
4  functioning. Given that 'a wide degree of deference to the employer's judgment is
5  appropriate' when 'close working relationships are essential to fulfilling public
6  responsibilities,' the balance of interests tips in favor of the City."); *Kannisto v. City and*
7  *County of San Francisco*, 541 F.2d 841, 843 (9th Cir. 1976) (police department "has a
8  substantial interest in developing discipline, *esprit de corps*, and uniformity…to insure
9  adequate promotion of safety of persons and property"). When this deference is properly
10  applied, the inescapable conclusion is that Hernandez's speech was unprotected.

11  On Hernandez's side of the equation, he is seeking protection for speech that
12  denigrates members of the Islamic faith (including mocking their beliefs and culture);
13  perpetuates anti-Muslim sentiments; and attempts to breed animosity between veterans
14  and Muslims. These matters, even if protected, do not reside at the core of the First
15  Amendment.  So, at most, Hernandez's speech has marginal value, if any at all.

16  In contrast to the limited (and possibly non-existent) value of Hernandez's speech,
17  the City has an overwhelming interest in preserving order, harmony, and discipline within
18  the Police Department.  There is perhaps no more important governmental function than to
19  protect the safety of its citizens.  Thus, numerous courts, including the Ninth Circuit, have
20  repeatedly recognized that police departments, as paramilitary organizations, are given the
21  highest deference when applying the *Pickering* balance. *Cochran*, 222 F.3d at 1201. As
22  shown below, Hernandez's purported right to post anti-Muslim material is dwarfed by the
23  City's compelling interests in restricting this type of disruptive speech.

24  Before discussing the City's compelling interests, it is important to note that, "in
25  executing the *Pickering* balance, courts should not require government employers to
26  demonstrate that the employee's speech actually disrupted efficient office operation;
27  rather, 'reasonable predictions of disruption' are sufficient." *Moran v. Washington*, 147
28

F.3d 839, 846 (9th Cir. 1998). Here, the consequences of Hernandez's divisive speech are easy to recognize.

As a starting point, police officers are held to the highest level of integrity, and it is critically important for the Police Department to have a positive and trusting relationship with the public in order to provide effective law enforcement services. Furthermore, it is crucial for police officers to trust their colleagues, since they may be required to rely upon them for back-up in potentially life-threatening situations.

Against this backdrop, Hernandez's postings can be reasonably expected to: 1) create discord between members of the Police Department who must work together closely to perform important public safety functions, including those who are Muslim or have family, friends, or loved ones who practice the Islamic faith; (2) create distrust of the Police Department among the general public; (3) discourage Muslims from reporting crimes or cooperating with law enforcement; and (4) create friction between police officers who are military veterans and members of the Islamic community. Based on these concerns alone, the Court should conclude that the *Pickering* balance weighs strongly in favor of the City.

Even though reasonable predictions of disruption would be sufficient for the City to prevail, the Court need not rely solely on the mere possibility that Hernandez's postings could cause public mistrust and discredit to the Police Department. As previously noted, the material publicized by the PVP (which included Hernandez's bigoted postings) resulted in a cascade of negative publicity. Perhaps even more troubling, a single article about Hernandez resulted in the following comments by members of the public:

- "[I]f someone who works a government job where a gun and large leeway to use it is standard equipment happens to be a bigot I'd say that's a rather important detail well worth considering, because that could all too easily(and with significant potential consequences) lead to some rather unpleasant interactions with the public. If someone is willing to be openly bigoted on social media for anyone to see odds are pretty good they are not going to maintain a professional attitude should they encounter a member from that group, and given the power and authority that police have that's not a minor concern."
- "A racist or bigoted cop is a lawsuit in the making."

7

- "When the employees in question can legally kill other people, I'd be asking myself if maybe those employees' social media histories could prove they're trying to pick their victims."

[*See* Comments to "Phoenix Cop Sues Department To Block Investigation Of Officers' Questionable Social Media Posts," attached as Exhibit A]

As the Ninth Circuit has expressly recognized, police officers are charged with preserving the integrity and image of the department, and therefore, speech that results in public denigration of the agency loses its protection. *See Dible v. City of Chandler*, 515 F.3d 918, 928-29 (9th Cir. 2008). These precise circumstances exist here, as demonstrated by the public's response to the postings.

Furthermore, courts have repeatedly found that a plaintiff's right to engage in racist off-duty speech is outweighed by a public employer's interest in a harmonious work environment and a positive relationship with the public. *See, e.g., Locurto v. Guiliani*, 447 F.3d 159, 180 (2nd Cir. 2006) (rejecting First Amendment claim where police officers were terminated based on concerns that their speech would cause the public, and particularly members of minority communities, to regard the police department as racist); *Pappas v. Giuliani*, 290 F.3d 143, 145, 151 (2nd Cir. 2002) (holding that the plaintiff's right to anonymously distribute "offensive racially bigoted materials" was outweighed by his employer's interest "in promoting the efficiency of the public service it performs"); *Spetalieri v. Kavanaugh*, 36 F.Supp.2d 92, 100, 106 (N.D.N.Y. 1998) (even assuming the plaintiff's off-duty speech in which he spoke "in a denigrating manner about African-Americans" touched on a matter of public concern, the "potential for disruption in the" police department "outweighs the value of [the] plaintiff's speech.").

The same reasoning applies to bigoted speech that is targeted at Muslims. In sum, Hernandez's speech is worthy of little or no protection. In contrast, the City's interests are strong enough to not just tip the balance in its favor, but to break the scale. Accordingly, Hernandez's request for injunctive relief should be denied.

### 3. The Decisions In *Roe* And *Dible* Support The City's Position.

This Court asked Hernandez to discuss *Roe* and *Dible* in his Motion, but he did nothing more than make a cursory reference to these cases in a footnote. [Motion at p. 9 n. 3] Hernandez's avoidance of *Roe* and *Dible* is not surprising, however, because both decisions support the City's position by affirming that a police department may regulate off-duty speech that results in discredit or disruption to the organization, as was the case with Hernandez's incendiary Facebook postings. *City of San Diego, Cal. v. Roe*, 543 U.S. 77, 84 (2004); *Dible*, 515 F.3d at 928.

The *Dible* decision is particularly illuminating regarding the flaws with Hernandez's First Amendment claim. There, a police officer was terminated for bringing discredit to the department based on his involvement in creating pornographic content for a website. He brought suit alleging that his conduct, which involved producing and engaging in sexual acts on film, was protected speech. *Id.* at 924.

For part of its analysis of the First Amendment claim, the Ninth Circuit treated the plaintiff's speech as unrelated to his employment as a police officer, a classification that may invoke more sweeping protections. *Id*. at 927 (recognizing that there is ambiguity as to whether speech that is unrelated to employment must be on a matter of public concern). Even under this standard, the Ninth Circuit concluded the termination decision was lawful because any purported First Amendment protection was outweighed by the detrimental impact of the plaintiff's conduct on the organization:

> The interest of the City in maintaining the effective and efficient operation of the police department is particularly strong. It would not seem to require an astute moral philosopher or a brilliant social scientist to discern the fact that Ronald Dible's activities, when known to the public, would be "detrimental to the mission and functions of the employer." *Roe*, 543 U.S. at 84, 125 S.Ct. at 526. And although the government's justification cannot be mere speculation, it is entitled to rely on "reasonable predictions of disruption." *Waters v. Churchill*, 511 U.S. 661, 673, 114 S.Ct. 1878, 1887, 128 L.Ed.2d 686 (1994) (plurality opinion).
>
> Police departments, and those who work for them, are engaged in a dangerous calling and have significant powers. The public expects officers to behave with a high level of propriety, and, unsurprisingly, is outraged when they do not do so. The law and their own safety demands that they be

9

given a degree of respect, and the sleazy activities of Ronald and Megan Dible could not help but undermine that respect.

*Id.* at 928. The court further noted that because of the "unique and sensitive position of a police department and its necessary and constant interactions with the public[,]" the government may properly account for the "public's perception of the officers' actions when [considering] the potential for disruption of the department's functions." *Id.* at 929.

The unmistakable lesson from *Dible* is that a police department has the right to discipline officers for off-duty speech that is harmful to the public's perception of the organization, regardless of whether such speech is employment-related. Moreover, in doing so, a police department is permitted to rely on common sense predictions that certain types of speech are virtually certain to erode community trust. *See Sabatini*, 369 F. Supp. 3d at 1090 ("[*Dible*] makes clear that the likelihood of harm to a public employer's reputation and the community's trust can be self-evident. Indeed, it is well established that a public employer does not need to 'allow events to unfold to the extent' that the harm caused by its employee's speech 'is manifest before taking action.'").

As in *Dible*, it does not require great wisdom to intuit that the vile, anti-Muslim postings by Hernandez are harmful to the Police Department's reputation among the general public and virtually certain to disrupt the efficiency of the operation and impair relationships. Indeed, the media stories and public comments confirm as much. Thus, under the reasoning from *Dible*, Hernandez's speech is unprotected.

**B.     Plaintiffs Cannot Succeed On Their Facial Challenge To The Policy.**

Plaintiffs' facial challenge to the social media policy is unavailing. While Plaintiffs' Motion is heavy on legal citations, it is extraordinarily light on substance. Indeed, although Plaintiffs ask this Court to enjoin the enforcement of five policy provisions, they discuss only a single sentence in their Motion (at p. 1), which (1) is taken out of context; and (2) ironically, is not the basis for the proposed disciplinary action against Hernandez. Specifically, Plaintiffs cherry-picked the following language from Section 3.27.9.B.(6) in an attempt to create the misleading impression that the social media policy is unconstitutionally overbroad: "Employees are prohibited from using

10

social media in a manner that would cause embarrassment to or discredit the Department in any way."[3]  [Exhibit 3 to Complaint at p. 5]  Rather than taking the myopic view advocated by Plaintiffs, this Court must consider the challenged provision in the context of the broader policy, and, if possible, apply a limiting construction to avoid a finding of unlawfulness.  *Virginia v. Am. Booksellers Ass'n, Inc.*, 484 U.S. 383, 397 (1988); *Sabatini*, 369 F. Supp. 3d at 1097 (recognizing that the court must construe a challenged provision "in the context of the broader social-media policy and 'consider whether the [policy] is 'readily susceptible' to a limiting construction that would render it constitutional'").  When the proper standard is utilized, the policy must survive.

As an initial matter, it is important to note that because Plaintiffs have identified only a single sentence from the social media policy as allegedly having a chilling effect (Section 3.27.9.A.(1)), their standing to challenge the policy must be limited to that sentence only.  The following passage from *Montclair Police Officers' Ass'n v. City of Montclair* is instructive:

> Although Plaintiffs have shown that they have censored themselves based on a well-founded fear of punishment under the Policy, Plaintiffs can only challenge the Policy as to those provisions that caused them to censor themselves. . . .  Plaintiffs can only maintain standing as to the policies impacted by the allegations detailed in their Complaint.  Thus, Plaintiffs have standing to challenge only those provisions that are related to self-censorship.

CV126444PSGPLAX, 2012 WL 12888427, at *3 (C.D. Cal. Oct. 24, 2012) (internal citations omitted).  Under this reasoning, the Court should reject Plaintiffs' attempt to enjoin all but Section 3.27.9.A.(1) of the social media policy.

Even putting aside the standing issue, Plaintiffs' facial challenge to the policy is flawed.  In assessing a preemptive attack on a restriction on speech, courts apply a modified version of the *Pickering* framework.  *Sabatini,* 369 F. Supp. 3d at 1090.  First, courts assess the policy's breadth by examining its text to determine "whether the

---

[3] Although the challenged sentence is quoted in the investigation of Hernandez, the PSB did not find a violation of Section 3.27.9.A.(1).  [*See* Exhibit 20 to Complaint at p. 7] Contrary to Plaintiffs' misguided assertion (at p. 1), Hernandez is facing discipline for violating a separate and distinct part of the social media policy: Section 3.27.9.B.(6), which targets speech that impairs working relationships, is detrimental to the mission and functions of the Department, or undermines public confidence.  [*Id*. at pp. 8-9]

11

restriction reaches speech on a matter of public concern." *Id.*; *see also Field Day, LLC v. Cty. of Suffolk*, 463 F.3d 167, 174 (2d Cir. 2006) ("A "facial challenge" to a statute considers only the text of the statute itself, not its application to the particular circumstances of an individual."). Courts then look to the public employer's justification for the policy, weighing "the impact of the ban as a whole—both on the employees whose speech may be curtailed and on the public interested in what they might say—against the restricted speech's 'necessary impact on the actual operation' of the Government." *Id.*

Here, assuming arguendo that the social media policy reaches speech on a matter of public concern, the restrictions are justified based on the overwhelming need to promote efficiency, order, and discipline within the Police Department.

When the "PERSONAL USE" section of the social media policy (which contains the challenged language) is examined as a whole, the context makes clear that it is intended to balance an employee's right to engage in protected speech against the disruption to the Police Department, with the end result being that the policy only restricts speech when the balance tips in the City's favor. As confirmation of this, the Court should take note of the following:

- Section 3.27.9(A), which contains the single sentence that Plaintiffs reference in their Motion, begins with the following prefatory statement: "Department personnel are cautioned their speech and related activity on social media sites may be considered a reflection upon their position, and, in some instances, this Department." This general guidance, which provides context for the policy, is in line with the *Roe* and *Dible* courts' observations that police officers have a duty to safeguard the image of the department. [Exhibit 3 to Complaint at p. 5]

- Sections 3.27.9(A)(2) and 9(A)(3), which Plaintiffs disregard entirely in their Motion, state that "Employees are responsible for their social media postings if they are found to be in violation of any City or Department policy" and "Employees may not use social media to harass, discriminate, bully, retaliate, etc." These restrictions are appropriately targeted at speech that impairs relationships, erodes public trust, or

otherwise violates an independent City policy.  [*Id*.]

- Section 3.27.9(B) of the social media policy is prefaced with the following statement:  "Personal social media activity must not interfere with work duties or the operation of the department."  This makes clear that there must be some nexus between the speech and an employee's job for the restrictions to apply, thus limiting the reach of the policy.  [*Id*.]

- Section 3.27.9(B)(6), which was cited by PSB as a basis for possible discipline against Hernandez, explicitly recognizes that police officers are "free to express themselves as private citizens on social media sites to the degree that their speech does not impair working relationships of the Department, are detrimental to the mission of and functions of the Department, that undermine respect or public confidence in the Department, cause embarrassment to the Department or City, discredit the Department or City, or undermine the goals and mission of the Department or City." This largely aligns with the factors relevant to the *Pickering* balance, and disproves Plaintiffs' erroneous contention (at p. 11) that the City does not weigh the employees' interests.[4]  [*Id*. at p. 6]

As previously noted, in deciding the question of overbreadth, the Court must consider whether the policy is "readily susceptible" to a limiting construction that would render it constitutional. *Powell's Books, Inc. v. Kroger*, 622 F.3d 1202, 1208 (9th Cir. 2010).  When looked at in totality, the social media policy involves an appropriate balancing of both sides' interests and imposes restrictions only if (1) the employee's speech impacts the workplace; and (2) the disruption to the organization and/or impairment to relationships outweighs any constitutional protection.  Therefore, this Court should deny Plaintiffs' request for injunctive relief.

---

[4] In the Motion, Plaintiffs attack the policy as vague (at p. 10) on the basis that the PSB found that only four of Hernandez's eleven posts violated the policy's terms. Ironically, these facts serve to confirm that the City applies the social media policy on a case-by-case basis, taking into consideration the exact nature of the employee's speech and the interests implicated.  Moreover, Hernandez cannot bring a "void for vagueness" challenge because his bigoted posts clearly violated the social media policy. *Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc*., 455 U.S. 489, 495 (1982) ("A plaintiff who engages in some conduct that is clearly proscribed cannot complain of the vagueness of the law as applied to the conduct of others.").

The decision in *Sabatini* is instructive on this issue. There, the police department adopted a social media policy stating that employees "are free to express themselves as private citizens in matters of public concern" as long as their speech doesn't "[i]mpair working relationships," "[i]mpede the performance of duties," "[i]mpair discipline and harmony among coworkers," or "[n]egatively impact or tend to impact the department's ability to serve the public" – a restriction that is similar in scope to the City's policy. 369 F. Supp. 3d at 1096. The court reasoned that "[b]ecause the policy formulaically prohibits only the types of speech that would tilt the *Pickering* balance in Metro's favor, it is difficult to conclude that the policy as whole is overbroad." *Id*. at 1096-97.

The court then considered one particular facet of the challenged policy: a prohibition on "speech that ridicules, maligns, disparages, or otherwise promotes discrimination against race, ethnicity, religion, sex, national origin, sexual orientation, age, disability, political affiliation, gender identity and expression or other explicit class of individuals ...." *Id*. at 1097. The *Sabatini* court acknowledged that this language may reach some protected speech, but recognized the duty to assess the plaintiff's challenge "in the context of the broader social-media policy" and to consider whether the provision "is 'readily susceptible' to a limiting construction that would render it constitutional." *Id*.

The court concluded that the policy was appropriately restricted in scope because it does "not prohibit [] employees from speaking on matters of department policy or actions and from thus bringing to light what 'ails' the community's police force. Nor does the policy prohibit employees from commenting on any particular topic, related or unrelated to the employee's work. Rather, the policy's objective--repeated throughout its text--is to prevent its employees from posting content online that would impair its ability to function by, among other things, eroding the public's trust in the department." *Id.* at 1099. By the same token, the Police Department does not ban criticism of the organization or prohibit commentary on particular subjects. Instead, the policy only regulates speech that is detrimental to the Police Department's operations. [Exhibit 3 to Complaint at p. 6]

Finally, the *Sabatini* court found that the defendant had a compelling justification for the social media policy, explaining that:

> Metro has a strong interest in maintaining public trust by prohibiting speech that would cause the public to question its ability to "enforce[ ] the law fairly, even-handedly, and without bias." And although a prospective restriction on speech requires a greater showing than post-hoc discipline, I find that Metro's interest still satisfies this higher burden because public faith in the fair, unbiased administration of public institutions—especially the criminal-justice system—is fundamental to our democratic society. That trust is eroded by police-officer speech that "ridicules, maligns, disparages, or otherwise promotes discrimination against race, ethnicity, religion, sex," etc. Accordingly, there is a "close and rational relationship" between Metro's interest in preserving the public's trust and its social-media policy, which is tailored to prohibit speech that Metro has a legitimate and overriding interest in prohibiting under the *Pickering* framework. The plaintiffs' overbreadth prospective-restriction claims therefore fail.

Likewise, the City has an equally compelling reason for prohibiting speech that impairs relationships, disrupts operations, or brings discredit to the Police Department. So under the reasoning from *Sabatini*, the policy must survive Plaintiffs' facial challenge.[5]

Finally, if this Court finds any overbreadth, it should be limited to Section 3.27.9.A.(1) only and the rest of the policy should be unaffected.

## II.     PLAINTIFFS WILL NOT SUFFER IRREPARABLE HARM.

A party seeking an injunction must show a possibility of irreparable injury that is not remediable by damages. *Nouveau Riche*, 2008 WL 5381513, at *4. Assuming for argument's sake that Plaintiffs had any likelihood of success on the merits, the Motion should still fail based on Plaintiffs' inability to satisfy this requirement.

Hernandez is not entitled to injunctive relief because all of the possible disciplinary actions he is facing (suspension, demotion, or termination) are remediable by monetary damages. The Supreme Court's decision in *Sampson v. Murray* is directly on point. 415 U.S. 61 (1974). There, a public employee sought to enjoin her termination pending the outcome of her appeal to the Civil Service Commission. She argued that injunctive relief was appropriate because her prospective discharge would cause her embarrassment and loss of income. The Court disagreed, explaining that: "The key word in this consideration is irreparable. Mere injuries, however substantial, in terms of money, time and energy

---

[5] The *Sabatini* court also distinguished Metro's policy from the one at issue in *Liverman v. City of Petersburg*, a case cited by Plaintiffs. 844 F.3d 400 (4th Cir. 2016). The *Liverman* policy swept so broadly that it prohibited any public criticism of the police department. *Id.* at 407. In contrast, the policy at issue in *Sabatini* targeted speech that would impair the function of the police department. 369 F. Supp. 3d at 1090. This same distinction renders *Liverman* inapposite with regard to the Police Department's social media policy.

15

necessarily expended in the absence of a stay, are not enough.  The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm." *Id*. at 90.  The Court further noted that there is a longstanding precedent against granting injunctions in employment disputes in all but the most extraordinary cases, stating:

> We recognize that cases may arise in which the circumstances surrounding an employee's discharge, together with the resultant effect on the employee, may so far depart from the normal situation that irreparable injury might be found. Such extraordinary cases are hard to define in advance of their occurrence. We have held that an insufficiency of savings or difficulties in immediately obtaining other employment—external factors common to most discharged employees and not attributable to any unusual actions relating to the discharge itself—will not support a finding of irreparable injury, however severely they may affect a particular individual.

*Id*. at 91, n. 68.  Here, Hernandez has not articulated any circumstances that would depart from the ordinary disciplinary case, much less made the extraordinary showing necessary to justify a preliminary injunction.

As a further reason to deny the Motion, if Hernandez were to be suspended, demoted, or terminated (which is uncertain at this time), he will have the opportunity to appeal the decision to an independent Civil Service Board for a *de novo* review.  If he prevails, the discipline will be revoked and he may recover any lost wages.  And if he is dissatisfied with the outcome of the personnel appeal, he can seek a special action review to determine if the Civil Service Board's decision was arbitrary, capricious or involved an abuse of discretion.  *Woerth v. City of Flagstaff*, 167 Ariz. 412 (Ariz. Ct. App. 1990).  Simply put, Hernandez is not without options for seeking recourse.  To the contrary, there are multiple procedural safeguards in place to protect his interests. For this additional reason, his request for injunctive relief is flawed.

As an alternative basis for injunctive relief, Plaintiffs argue that there is irreparable harm based on the alleged chilling effect of the social media policy.  Not so.  There are two important considerations that repudiate this argument.

First, it is worth noting that despite the fact that the social media policy has been in place since August 2013, the City is unaware of any allegation of a chilling effect prior to

1  this lawsuit.  If anything, the postings that were unearthed by the PVP, including those by
2  Hernandez, suggest that many officers were far too liberal with their speech on social
3  media.  [*See* "Phoenix officers exposed for racist, violent Facebook posts" ABC 15
4  Arizona, Jun. 3, 2019, attached as Exhibit B]
5        Second, and perhaps most importantly, the social media policy does not enact a
6  blanket prohibition on any type of speech; rather, it simply regulates a particular forum –
7  content posted on social media sites.  [Exhibit 3 to Complaint at p. 4]  Thus, employees
8  who are uncertain of whether their speech may violate the social media policy are free to
9  utilize other forums without running afoul of the challenged provisions, such as writing a
10 letter to the editor, holding a press conference, composing an email chain, or speaking to
11 other people.  Because no voices will be completely silenced, there is no irreparable harm.

## III.  THE BALANCE OF HARDSHIPS WEIGHS IN THE CITY'S FAVOR.

13       It is well-settled that police departments have an overwhelming and compelling
14 interest in managing their operations.  *See, e.g., Aguilera*, 510 F.3d at 1171.  The harm
15 caused to an employer – especially a municipal police department charged with protecting
16 the citizens of the community – if it cannot take appropriate disciplinary action in
17 response to conduct that impairs order and causes distrust in the community is extensive
18 and highly consequential. Furthermore, the City's general social media policy is not an
19 adequate substitute, as Plaintiffs contend (at p. 2), because of the unique issues and
20 deference that apply in the police context.
21       On the other hand, any alleged hardship to Plaintiffs is minimal because, as noted
22 above, the challenged policy only applies to speech in the social media context.  Thus, the
23 actual harm to the City outweighs any potential harm to Plaintiffs.

## CONCLUSION

25       For the foregoing reasons, Defendants respectfully request that the Court deny
26 Plaintiffs' Amended Motion for a Preliminary Injunction.

RESPECTFULLY SUBMITTED this 1st day of November 2019.

**PIERCE COLEMAN PLLC**

By /s/ Stephen B. Coleman
    Stephen B. Coleman
    7730 E. Greenway Road, Ste. 105
    Scottsdale, Arizona 85260
    *Attorneys for Defendants*

**CERTIFICATE OF SERVICE**

I hereby certify that on November 1, 2019, I electronically transmitted the attached document to the Clerk's Office using the ECF System for filing and caused a copy to be electronically transmitted to all ECF registrants:

Steven J. Serbalik
**STEVEN J. SERBALIK, P.L.C.**
4925 East Desert Cove Avenue #116
Scottsdale, Arizona 85254
*Attorneys for Plaintiffs*

By: /s/Karen M. Chenowth
4812-4124-4841, v. 1