**WO**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Juan Hernandez, et al., | No. CV-19-05365-PHX-MTL |
| Plaintiffs, | **ORDER** |
| v. | |
| City of Phoenix, et al., | |
| Defendants. | |

This action was initiated by two plaintiffs, Sergeant Juan Hernandez of the Phoenix Police Department (the "Department") and the Arizona Conference of Police and Sheriffs ("AZCOPS"), which is a group "dedicated to fair representation of law enforcement officers located around the State of Arizona." (Doc. 1 at 3). Plaintiff Hernandez is one of the hundreds of Phoenix police officers who are AZCOPS members. (Doc. 1 at 3; Doc. 12 at 2). Presently before the Court is Plaintiffs' Amended Motion for a Preliminary Injunction. Plaintiffs seek a preliminary injunction against the City of Phoenix, Chief of Police Jeri Williams, and Commander Shane Disotell to prohibit potential disciplinary action under the Department's Social Media Policy. Plaintiffs' request a preliminary injunction based on prospective discipline of Plaintiff Hernandez for his previous social media posts which Plaintiffs claim would be a violation of his free speech rights and to enjoin enforcement of the Department's Social Media Policy based on the claim that the threat of discipline has chilled employee speech as it relates to commenting on matters of public concern in violation of their free speech rights.

## I.    INTRODUCTION

### A.    Factual Background

This factual recitation derives from the Plaintiffs' Complaint, the parties' written submissions on the Amended Motion for Preliminary Injunction, and the evidentiary hearing held on November 19, 2019 (argument only was continued on November 22, 2019). The City of Phoenix and the Department have adopted various rules and policies concerning employee conduct that takes place outside of work hours. These polices can be found in the Phoenix Police Departments' Operations Orders Manual and in the City of Phoenix's Administrative Regulations that are applicable to all city employees. Particularly relevant to this case are the Department's Social Media Policy, which was adopted in August 2013 and can be found in Operations Order 3.27, and the Department's Purpose Statement and Guiding Values, which are in Operations Order 1.1.

On or about June 1, 2019, a group known as the Plain View Project publicized several Facebook social media posts made by various law enforcement officers. The posts of a number of officers in the Department, including Plaintiff Hernandez were publicized. (Doc. 1 at 3-5). While the Plain View Project republished 11 of Plaintiff Hernandez's posts, the Department only seeks to potentially discipline him for four posts:

> (1) September 30, 2013: A meme[1] with what appears to be mugshots of men of Middle Eastern descent and containing the text "THE MOST COMMON NAME FOR A CONVICTED GANG RAPIST IN ENGLAND IS . . . Muhammad Note to the British media – these gangs are not comprised of 'Asians'; they are <u>Muslims</u>." [Doc. 1-2, Exhibit 4];

> (2) October 8, 2013: A meme entitled "You just got to love the Brits" recounting a story in which a Muslim taxi passenger asked the driver to turn off the music in the car for religious reasons, to which the driver responded "[i]n the time of the

---

[1]    "A meme is 'an idea, behavior, style, or usage that spreads from person to person within a culture.' Meme, Merriam–Webster Online Dictionary (available at http://www.merriam-webster.com/dictionary/meme) (last accessed November 6, 2015)." *Braham v. Sony/ATV Music Publ'g*, No. 215CV8422MWFGJSX, 2015 WL 7074571, at *4, n.4 (C.D. Cal. Nov. 10, 2015).

prophet, there were no taxis, so piss-off and wait for a camel!" [Doc. 1-2, Exhibit 5];

(3) December 24, 2013: A meme entitled "RECENT CONTRIBUTIONS TO SCIENCE BY ISLAM" in which Muslim scholars and theologians expressed controversial opinions regarding female drivers, DNA testing in rape cases, the Earth revolving around the Sun, and the link between dressing modestly and earthquakes. [Doc. 1-2, Exhibit 6]; and

(4) January 9, 2014: Article entitled "Military Pensions Cut, Muslim Mortgages Paid by US!" [Doc. 1-2, Exhibit 10].

The Department's Professional Services Bureau (the "PSB") investigates violations of Department policies, including the Department's Social Media Policy. Commander Disotell leads PSB; however, at the time Plaintiffs filed this suit, he was on temporary assignment outside of Arizona. In his absence, Lieutenant Matthew Siekmann is in charge of PSB. On June 3, 2019, PSB opened an investigation into the Department officers whose posts appeared on the Plain View Project website. PSB investigators interviewed Plaintiff Hernandez on June 20, 2019. They questioned him regarding the four posts described herein. When asked about his motivation for his posts, Plaintiff Hernandez told investigators that he wanted to foster discussion about issues including assimilation and veteran benefits.

On October 9, 2019, Commander Disotell issued a report to Chief Williams concerning Plaintiff Hernandez's Facebook posts. The report concluded that certain of Plaintiff Hernandez's Facebook posts violated both the Social Media Policy and the Department's Purpose Statement and Guiding Values. (Doc. 17 at 3). Specifically, the PSB report found infractions with respect to the following Social Media Policy provision:

> Department personnel are free to express themselves as private citizens on social media sites to the degree that their speech does not impair working relationships of this Department, are detrimental to the mission and functions of the Department, that [*sic*] undermine respect or public confidence in the Department, cause embarrassment to the Department or the City, discredit the Department or City, or undermine the goals and mission of the Department or City.

Operations Order 3.27.9.B.(6), (New 08/13). (Doc. 1-2 at 78).

The PSB report also concluded that Plaintiff Hernandez's posts violated the following provision of the Department's Guiding Values: "Responsibility and Respect: We respect and honor the inherent dignity of all people, including ourselves, and pledge fair and equal treatment for all." Operations Order 1.1.2.B.(3). (Doc. 1-2 at 79).

The report also concluded that Plaintiff Hernandez's posts "could potentially spread fear and hatred towards people of Middle Eastern descent, as well as those practicing the Muslim faith. In addition [the posts] potentially reduced or contributed to the erosion of public trust. . . ." (Ex. 104 at 0028 (admitted into evidence November 19, 2019 (Doc. 31)). The report noted that the job description of a Phoenix police sergeant requires integrity, knowledge of social problems, and cultural diversity. (*Id*.). Moreover, the report says that testifying in court, as is sometimes required for police sergeants, is more complicated after an officer demonstrates bias. (*Id*.). Overall, the report concludes, the posts for which Plaintiff Hernandez is under investigation "do not align with the distinguishing features, essential functions and required knowledge as outlined in the City of Phoenix classification for a Police Sergeant." (*Id*.). The report said that the type of policy violation at issue requires a "referral to the [Disciplinary Review Board] for a possible demotion and/or 40, 80, or 240 hours suspension, or termination or referral to the Police Chief (or designee) for a. . .[h]earing." (*Id*. at 0029).

The Department's Disciplinary Review Board consists of an assistant chief, commanders, peers and civilians. (Doc. 1 at 8). It was set to meet on October 15, 2019 to consider disciplinary action against Plaintiff Hernandez. (*Id*.). Five days before that hearing, Plaintiffs filed a Complaint in this Court. (Doc. 1). Plaintiffs attached Operations Order 3.27 to the Complaint; Operations Order 3.27 is the six-page Social Media Policy. In the Complaint, Plaintiffs allege that the Social Media Policy is unconstitutional on its face because it is overbroad, chills protected speech involving matters of public concern, and is impermissibly vague because there is no discernable standard for enforcement and Defendants enforce the policy arbitrarily. (Doc. 1 at 9-10). In the Amended Motion for

Preliminary Injunction, Plaintiff Hernandez specifically alleges that Defendants seek to discipline him for speaking on matters of public concern without appropriate justification. (Doc. 20 at 2-6). He thus argues that the Social Media Policy is unconstitutional as applied to him.

Also alleged in the Complaint, but not before the Court in the Amended Motion for Preliminary Injunction, Plaintiff Hernandez alleges that Chief Williams and Commander Disotell intentionally or recklessly allowed an investigation and proposed disciplinary action against him in violation of both the First Amendment and its Arizona counterpart. Plaintiff Hernandez alleges that Chief Williams and Commander Disotell negligently allowed the PSB investigation against him. Lastly, both Plaintiffs allege that the City of Phoenix and Chief Williams failed to train Commander Disotell in constitutionally permissible means of conducting internal investigations.

Defendants agreed to postpone disciplinary action against Sgt. Hernandez pending the resolution of the Motion before the Court. (Doc. 11). After an initial hearing, Plaintiffs filed a Notice of Change In Factual Circumstances. (Doc. 16). This document alleges that Chief Williams announced that she would discipline officers for violating the Social Media Policy, taking the form of everything from written warnings to a termination. The Notice did not specify whether any of the officers Chief Williams was referring to were AZCOPS members, but Plaintiffs said that the announcement evidenced the chilling effect of the Social Media Policy. (*Id.*).

**B. PROCEDURAL BACKGROUND**

Plaintiffs filed their Complaint along with a request for both a temporary restraining order and preliminary injunction on October 10, 2019. (Docs. 1 and 2). In asking the Court to enjoin enforcement of the Social Media Policy, Plaintiffs argue that the policy is facially overbroad, vague and subject to arbitrary enforcement. (Doc. 12 at 6-8, 10; Doc. 20 at 11). Plaintiffs seemingly argue that disciplining Plaintiff Hernandez would be retaliation for Plaintiff Hernandez exercising his First Amendment rights and would send a chilling effect, causing members of AZCOPS to self-censor for fear of being disciplined themselves. (*See*

Doc. 20 at 2). This Court held a hearing the day after Plaintiffs filed the Complaint. (Doc. 11). Because Defendants agreed to postpone Plaintiff Hernandez's disciplinary hearing pending the resolution of the preliminary injunction motion, (*id*.), the request for a temporary restraining order became moot. Plaintiffs later filed an Amended Motion for Preliminary Injunction (Doc. 12). Defendants responded (Doc. 17). Plaintiffs filed a reply (Doc. 20). This Court held hearings on this matter on November 19 and November 22, 2019.

## II. ANALYSIS

A preliminary injunction is an extraordinary remedy that a court never issues as a matter of right. *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 24 (2008). "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor and that an injunction is in the public interest." *Id*. at 20. In the Ninth Circuit, a showing that there are "serious questions going to the merits and a hardship balance that tips sharply toward the plaintiff can support issuance of an injunction, assuming that the other two elements of the *Winter* test are also met." *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1134-35 (9th Cir. 2011).

### A. Likelihood of Success on the Merits

#### 1. Governing law

Plaintiffs frame their request for a preliminary injunction as follows: "…the question presented is whether the Phoenix Police Department's Social Media Policy violates the First Amendment rights of Phoenix Police Department employees." (Doc. 12 at 7-8). The Social Media Policy to which Plaintiffs refer is six-single-spaced pages. (Doc. 1-2 at 6-11). At no point do Plaintiffs specify exactly which portion(s) of the Social Media Policy allegedly violates their First Amendment rights such that an injunction would be justified.

Instead, Plaintiffs give only one example in their motion of how a particular portion of the Social Media Policy might justify an injunction. In that example, Plaintiffs state,

"Specifically, the plain language of the PD Policy – 'Employees are prohibited from using social media in a manner that would cause embarrassment to or discredit the Department in any way' – does not limit its scope to prohibit actions taken in furtherance of department duties. [citation omitted]. Accordingly, this Court should find that the PD Policy reaches beyond the scope of Plaintiff Hernandez's and police officers' official duties." (Doc. 12 at 8-9). This language is one portion of Operations Order 3.27.9.B.(6). Again, Plaintiffs do not specify if this identified language alone forms the basis for their request for injunction. Nonetheless, it is the only language identified by Plaintiffs as potentially justifying their injunction.

As indicated above, the Court knows from the PSB report which portion of the Social Media Policy forms the underlying basis for Plaintiff Hernandez's prospective disciplinary proceeding. (*See* Ex. 104). However, to the extent that Plaintiff AZCOPS purports to be in a different position than Plaintiff Hernandez or to be making a different argument than Plaintiff Hernandez, at no point does Plaintiffs' counsel delineate between these two Plaintiffs and their different factual postures.

Thus, on this record, it will be very difficult for AZCOPS to establish it is likely to succeed on the merits independent of Plaintiff Hernandez because Plaintiffs have made no arguments specific to this entity or its members. In other words, all of the factual arguments in the motion appear to be tied to Plaintiff Hernandez's discipline; thus, as the record stands, AZCOPS is limited by the arguments both Plaintiffs have jointly advanced on behalf of Plaintiff Hernandez.

To succeed on the merits, or to show serious questions going to the merits, Plaintiffs must prevail under the *Pickering* (and its progeny) test. *See generally Pickering v. Board of Education*, 391 U.S. 563 (1968). As discussed more fully below, *Pickering* (and its progeny) set forth the test for when the government may constitutionally regulate an employee's speech. In other words, in the context of an employment relationship with the government, *Pickering* (and its progeny) are the only avenue by which Plaintiffs may prevail. A unique test is required for employees (as opposed to private citizens) because,

as the Supreme Court has stated, "[i]n *Pickering* and a number of other cases we have recognized that [the government] may impose restraints on the job-related speech of public employees that would be plainly unconstitutional if applied to the public at large." *United States v. Nat'l Treasury Employees Union*, 513 U.S. 454, 465 (1995) ("*NTEU*"). Similarly, the Supreme Court has stated, "surely a public employer may, consistently with the First Amendment, prohibit its employees from being 'rude to customers,' a standard almost certainly too vague when applied to the public at large." *Waters v. Churchill*, 511 U.S. 661, 673 (1994) (plurality); *cf. Drake v. Covington Cty. Bd. of Ed.,* 371 F. Supp. 974, 976 and n.4 (M.D. Ala. 1974) (holding under *Pickering* that if the Government prevails under a *Pickering* analysis, the Court need not reach a facial challenge. ("Drake claims the immorality provision of this section, which provided the statutory basis for her dismissal, is void for vagueness. She attacks the constitutionality of the statute both on its face and as applied to her. Following the example of the Supreme Court in *Pickering v. Board of Education*, 391 U.S. 563, we consider first her challenge to the statute as applied. We then find it unnecessary to reach her challenge to the statute on its face.")).

In this case, the Court notes that Plaintiffs' briefing discusses the *Pickering* test as it relates to Plaintiff Hernandez, but also cites many cases that discuss the unconstitutionality of statutes for being too vague or overly broad as applied to private citizens and not in the employment context. The Court finds cases outside the employment context to be inapposite to this case. Plaintiffs appear to have arrived at the same conclusion as the Court regarding the governing law, as Plaintiffs' reply discusses only *Pickering* and its progeny and does not re-advance any vagueness or overbreadth arguments. (*See* Doc. 20; *see also* Doc. 35 at 44-45 (Plaintiff's counsel stating that *Pickering* and modified *Pickering* are the controlling test)).

### 2. Plaintiff Hernandez — *Pickering* and *Eng* (First Amendment Retaliation)

Defendants seek to hold a disciplinary hearing against Plaintiff Hernandez based on both the Social Media Policy (Ex. 104 at 0021, 0027) and based on Operations Order

1.1.2.B.(3) (Ex. 104 at 0029).  For Plaintiff Hernandez to obtain an injunction to prevent this disciplinary hearing, he must make the showing summarized in *Eng*.  *Eng* stated,

> It is well settled that the state may not abuse its position as employer to stifle "the First Amendment rights [its employees] would otherwise enjoy as citizens to comment on matters of public interest." *Pickering v. Bd. of Educ.,* 391 U.S. 563 (1968). Acknowledging the limits on the state's ability to silence its employees, the Supreme Court has explained that "[t]he problem in any case is to arrive at a balance between the interests of the [public employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Id.*
>
> In the forty years since *Pickering,* First Amendment retaliation law has evolved dramatically, if sometimes inconsistently.  Unraveling *Pickering's* tangled history reveals a sequential five-step series of questions: (1) whether the plaintiff spoke on a matter of public concern; (2) whether the plaintiff spoke as a private citizen or public employee; (3) whether the plaintiff's protected speech was a substantial or motivating factor in the adverse employment action; (4) whether the state had an adequate justification for treating the employee differently from other members of the general public; and (5) whether the state would have taken the adverse employment action even absent the protected speech.

*Eng v. Cooley*, 552 F.3d 1062, 1070 (9th Cir. 2009).

"Plaintiff bears the burden of showing that the speech addressed an issue of public concern." *Id.*  At the preliminary injunction hearing, the parties agreed that three of the questions were satisfied: whether Plaintiff spoke as a citizen rather than a public employee (question 2), whether the speech at issue was a substantial or motivating factor in the proposed discipline (question 3), and whether the proposed discipline would not have occurred but-for the speech (question 5). (Doc. 26 at 7-10).  Thus, in dispute is whether Plaintiff Hernandez spoke on a matter of public concern and whether Defendants' interests in the proper functioning of the Department outweigh Plaintiff's right to speak and the public's right to hear that speech.

### a.    Public Concern (question 1)

For the First Amendment's protections to potentially apply, the speech must involve a matter of public concern. *See Pickering*, 391 U.S. at 574. The Supreme Court and the Ninth Circuit have both declined to explicitly define "public concern," noting that the test "is not an exact science" and "rigid multi-part tests" would be inappropriate. *See Desrochers v. City of San Bernardino*, 572 F.3d 703, 709 (9th Cir. 2009) (internal citations

and quotation marks omitted); *see also City of San Diego v. Roe*, 543 U.S. 77, 83 (2004) (per curiam) ("the boundaries of the public concern test are not well defined. . ."). That said, internal employee grievances usually do not qualify as a matter of public concern. *Connick v. Myers*, 461 U.S. 138, 149 (1983). However, speech that helps citizens make informed decisions about government operations is very likely to be a matter of public concern. *McKinley v. City of Eloy*, 705 F.2d 1110, 1114 (9th Cir. 1983); *see also Eng*, 552 F.3d at 1072-1073.

Courts look to the "content, form and context of a given statement, as revealed by the whole record" to discern when speech is a matter of public concern. *See Connick*, 461 U.S. at 147-48. Of these factors, content is "the greatest single factor." *Desrochers*, 572 F.3d at 710.

### i.     Content

The Ninth Circuit Court of Appeals has explained that for speech

> [t]o address a matter of public concern, the content of the [] speech must involve "issues about which information is needed or appropriate to enable the members of society to make informed decisions about the operation of their government." *McKinley*, 705 F.2d at 1114 (internal quotation marks and citation omitted); s*ee also Gillette v. Delmore*, 886 F.2d 1194, 1197 (9th Cir. 1989) (describing "matter[s] of political, social, or other concern to the community" as matters of public concern). "On the other hand, speech that deals with 'individual personnel disputes and grievances' and that would be of 'no relevance to the public's evaluation of the performance of governmental agencies' is generally not of 'public concern.'" *See Coszalter v. City of Salem*, 320 F.3d 968, 973 (9th Cir. 2003) (quoting *McKinley*, 705 F.2d at 1114); *see also Connick*, 461 U.S. at 154 (stating that speech limited to "an employee grievance concerning internal office policy" is unprotected). The same is true of "speech that relates to internal power struggles within the workplace," and speech which is of no interest "beyond the employee's bureaucratic niche." *Tucker v. Cal. Dep't of Educ.*, 97 F.3d 1204, 1210 (9th Cir. 1996) (internal quotation marks and citation omitted).

*Desrochers*, 572 F.3d at 710 (footnote omitted).

As recounted above, the posts for which Plaintiff Hernandez is potentially subject to discipline are his September 30, 2013 post which said the most common name for a convicted gang rapist in England is Mohammad; his October 8, 2013 meme post which recounts the story of a Muslim man being kicked out of a taxi after asking the taxi driver to turn off the music in the car as a religious accommodation; his December 24, 2013 post

which listed controversial opinions by Muslim scholars and theologians; and his December 9, 2014 posting of an article entitled "Military Pensions Cut, Muslim Mortgages Paid by US!"

Plaintiff Hernandez casts his posts as being about issues of assimilation, federal spending and media coverage. (Doc. 12 at 10). However, the Court is not required to accept Plaintiff's characterization of his posts. *See Desrochers*, 572 F.3d at 711 ("…the plain language of the grievances differs from the sergeants' post hoc characterizations. We look to what the employees actually said, not what they say they said after the fact.").

Additionally, the Ninth Circuit has

> …defined the "scope of the public concern element . . . broadly," *Ulrich v. City & County of S.F.*, 308 F.3d 968, 978 (9th Cir. 2002), and adopted a "liberal construction of what an issue 'of public concern' is under the First Amendment," *Roe v. City & County of S.F.*, 109 F.3d 578, 586 (9th Cir. 1997). But there are limits. "In a close case, when the subject matter of a statement is only marginally related to issues of public concern, the fact that it was made because of a grudge or other private interest or to co-workers rather than to the press may lead the court to conclude that the statement does not substantially involve a matter of public concern." *Johnson*, 48 F.3d at 425; *see also Alpha Energy Savers, Inc. v. Hansen*, 381 F.3d 917, 925 (9th Cir. 2004) (quoting the "close case" language of *Johnson*, but deciding that "[t]his is . . . not a close case"); *Roe*, 109 F.3d at 586 (applying the "close case" language of *Johnson*).

*Desrochers*, 572 F.3d at 709–10. Further, the Supreme Court has cautioned that, "[t]he inappropriate or controversial character of a statement is irrelevant to the question [of] whether it deals with a matter of public concern." *Rankin v. McPherson*, 483 U.S. 378, 387 (1987).

Here, Plaintiff Hernandez's posts "did nothing to inform the public about any aspect of [his employer's] functioning or operation." *Roe*, 543 U.S. at 84. Thus, the content is not clearly a matter of public concern. At best, using Plaintiff's characterization of the posts, coupled with the Ninth Circuit's liberal construction policy, the posts are a "close call" as to whether they are matters of public concern. However, the Court can consider the true content of the posts, rather than Plaintiff's characterization. Considering the actual content of the posts, the Court finds the subject matter to, again at best, be only marginally related to matters of public concern. Looking at the true content, the Court finds that the

posts are more properly seen as relating to a personal grudge or other private interest. Accordingly, the Court finds that the content of the posts weighs against finding them to be on a matter of public concern.

### ii.    Context

> "To aid us in ascertaining when speech . . . rises to a level of public concern, we examine the context of the speech, particularly the *point* of the speech." *Roth*, 856 F.2d at 1405; *see also Gilbrook*, 177 F.3d at 866 ("An employee's motivation [is] relevant to the public-concern inquiry."). In other words, why did the employee speak (as best as we can tell)? Does the speech "seek to bring to light actual or potential wrongdoing or breach of public trust," or is it animated instead by "dissatisfaction" with one's employment situation? *Connick*, 461 U.S. at 148; *Roth*, 856 F.2d at 1405. The question of whether the speech was made to "further some purely private interest" is relevant to that inquiry, *Havekost*, 925 F.2d at 318, as is a determination of whether the speech was made in the context of a workplace "power struggle," *Tucker*, 97 F.3d at 1210 (internal quotation marks and citation omitted).

*Desrochers*, 572 F.3d at 715.

In this case, Plaintiff Hernandez's posts do not attempt to "bring to light" wrongdoing or breach of trust by the government.  Indeed, several of the posts relate to other countries, not Plaintiff Hernandez's local or national government.  Further, the posts seem to further a purely private interest.  On these facts, the Court finds that the context of Plaintiff Hernandez's posts weigh against them being on matters of public concern.

### iii.    Form

Whether the speech is made internally, to a limited audience, or publicly all factor into determining whether the form of the speech weighs in favor of the speech being of public concern.  *Derochers*, 572 F.3d at 714-715.  For example, "[p]ublic speech is more likely to serve the public values of the First Amendment. Private speech motivated by an office grievance is less likely to convey the information that is a prerequisite for an informed electorate." *Id*. (internal quotations and citations omitted). Thus, "a limited audience weighs against a claim of protected speech."  *Id.* at 714 (alterations omitted).

Facebook is a platform that allows users to communicate around the world.  *See generally United States v. Browne*, 834 F.3d 403, 405 (3rd Cir. 2016).  It is a two-way form of communication, meaning that those who view posts can express their views as well.  *See generally id* at 406.  Politicians sometimes use Facebook to let others in the community

know about topics of interest. *See Graziosi v. City of Greenville, Miss.*, 775 F.3d 731, 739 (5th Cir. 2015). Here, Plaintiff Hernandez's posts were set to public. (Doc. 26 at 64-65). Because Plaintiff Hernandez's posts were made publicly, through Facebook, the form weighs in favor of finding that the posts were matters of public concern.

### iv. Public Concern Conclusion

Although the form of Plaintiff Hernandez's communications weigh in favor of them being of public concern, the most important factor—content—does not. Further, the context of the posts also weighs against the posts being matters of public concern. Therefore, the Court finds Plaintiff Hernandez's speech was not on a matter of public concern.

### b. Government Justification (question 4) as to Plaintiff Hernandez

Because the Court has concluded that Plaintiff Hernandez did not speak on a matter of public concern, Plaintiff Hernandez is not entitled to the *Pickering* balancing. *Roe*, 543 U.S. at 82-83 ("a threshold inquiry (implicit in *Pickering* itself) [is] that in order to merit *Pickering* balancing, a public employee's speech must touch on a matter of 'public concern.'"). However, because whether the content of the posts should weigh in favor of the posts being on matters of public concern is a very close question,[2] the Court will

---

[2] Specifically, some courts have implied that speaking about race is always a matter of public concern. *See generally Alpha Energy Savers, Inc. v. Hansen*, 381 F.3d 917, 926–27 (9th Cir. 2004) ("Disputes over racial, religious, or other such discrimination by public officials are not simply individual personnel matters. They involve the type of governmental conduct that affects the societal interest as a whole—conduct in which the public has a deep and abiding interest. Litigation seeking to expose such wrongful governmental activity is, by its very nature, a matter of public concern."); *Connick*, 461 U.S. at 148, n.8 ("Mrs. Givhan's right to protest racial discrimination—a matter inherently of public concern—is not forfeited by her choice of a private forum." (citation omitted)). However, in both of these examples, the speaker was opposing or exposing discrimination.
The Court does not interpret these cases as being a blanket ruling that all racist speech is per se a matter of public concern merely because such speech mentions race. Instead the speech in this case is more accurately characterized as advancing a personal grudge or private interest—as the Court has concluded above. Nonetheless, the view point of the speech cannot form the basis of determining whether the content is a matter of public concern. *See Rankin*, 483 U.S. at 387. As a result, it is a close call as to whether such speech is merely advancing a private grudge against a large group of people or speaking on a matter of public concern because it impacts a large group of people, albeit in a very negative way. Again, the Court has concluded that, when looking at the true content of the speech, the speech in this case merely advances a private grudge; however, acknowledging

1    alternatively consider the *Pickering* balancing test to determine whether Plaintiff

2    Hernandez has shown a likelihood of success on the merits or serious questions going to

3    the merits.

4        As discussed above, under *Pickering* this Court must, "arrive at a balance between

5    the interests of the [public employee], as a citizen, in commenting upon matters of public

6    concern and the interest of the State, as an employer, in promoting the efficiency of the

7    public services it performs through its employees." *Eng*, 552 F.3d at 1070.

> "In conducting [the *Pickering*] balancing, courts must give government employers 'wide discretion and control over the management of [their] personnel and internal affairs. This includes the prerogative to remove employees whose conduct hinders efficient operation and to do so with dispatch.'" [citation omitted].
> …
> In balancing the competing interests, this court has considered a host of factors. We have inquired whether the speech (1) impaired discipline or control by superiors; (2) disrupted co-worker relations; (3) eroded a close working relationship premised on personal loyalty and confidentiality; (4) interfered with the speaker's performance of his or her duties; or (5) obstructed routine office operations. [citation omitted]. "[P]ublic employers need not allege that an employee's expression actually disrupted the workplace; 'reasonable predictions of disruption' are sufficient." [citation omitted]. Moreover, this court has weighed (6) whether the speaker directed the statement to the public or the media, as opposed to a governmental colleague, [citation omitted]; (7) whether the speaker served in a high-level, policy-making capacity; and (8) whether the statement was false or made with reckless disregard of the truth, [citation omitted]. Because the *Pickering* balance necessarily involves a fact-sensitive inquiry involving the totality of the circumstances, no single factor is dispositive.

19   *Gilbrook v. City of Westminster*, 177 F.3d 839, 867-68 (9th Cir. 1999), *as amended on*

20   *denial of reh'g* (July 15, 1999).

21       As discussed above, the government has greater authority to regulate the conduct of

22   its employees than the general public. *Roe*, 543 U.S. at 80. This need to regulate conduct

23   is particularly high with police employers, which have an interest in maintaining discipline,

24   esprit de corps, morale and uniformity. *See Cochran v. City of L.A.*, 222 F.3d 1195, 1201

25   (9th Cir. 2000). Courts give a wide degree of deference to the reasons law enforcement

26   agencies articulate for what is necessary to accomplish the public safety mission. *Connick*,

27

28   that this is a close question and the Ninth Circuit Court of Appeals' liberal reading of what is a matter of public concern, *Roe*, 109 F.3d at 586, the Court is alternatively applying the *Pickering* balancing test.

- 14 -

461 U.S. at 152.

Plaintiffs attempt to distinguish the cases Defendants cite about the need for discipline within the Department by noting that many of those cases do not address off-duty activity that did not directly refer to the police department. However, this distinction is unavailing because the effect the speech has on the Department is what the Department has an interest in regulating. This effect on the Department can be caused by on-duty or off-duty speech. *See generally Roe*, 543 U.S. at 80, 84 ("The [off-duty] speech in question was detrimental to the mission and functions of the employer.").[3]

Defendants articulate four specific needs in carrying out the public safety mission that underlie their proposed action in this case: (1) promoting unity among coworkers in

_____

[3] The Court notes that, in their motion, Plaintiffs specifically seek for this Court to make a finding that the Social Media Policy regulates speech beyond the scope of Plaintiff Hernandez and other officers' "official duties." (Doc. 12 at 8-9). However, Plaintiffs do not make any legal argument as to the result of such a factual finding.

The Court notes that the Ninth Circuit Court of Appeals touched on whether there is a different protection for public-employee speech that is off-duty and non-work-related in *Roe*. *See Roe v. City of San Diego*, 356 F.3d 1108, 1119 and n. 8 (9th Cir. 2004) *overruled by City of San Diego v. Roe*, 543 U.S. 77 (2004). The implied distinction appears to be that a public employee need not show that the speech at issue was on a matter of public concern as a threshold inquiry for the employee to be entitled to the *Pickering* balancing when the speech is off-duty and non-work-related. *Id*. at n. 8. The Supreme Court did not directly address this distinction in reversing *Roe*, but the Supreme Court reaffirmed that "a threshold inquiry (implicit in *Pickering* itself) [is] that in order to merit *Pickering* balancing, a public employee's speech must touch on a matter of 'public concern.'" *Roe*, 543 U.S. at 82-83; *see also Dible v. City of Chandler*, 515 F.3d 918, 926 (9th Cir. 2008) ("As the [Supreme] Court [in *Roe*] explained, before an employee is even entitled to have the balancing test applied, the 'speech must touch on a matter of 'public concern.''"). Reconciling *Roe*, *Pickering*, and *NTEU*, the Second Circuit has explained that speech is "work related" if speech impacts the work place. *See Piscottano v. Murphy*, 511 F.3d 247, 272 (2d Cir. 2007) ("The *NTEU* principle does not immunize an employee's expressive activities—even those that take place during his off-duty hours and outside of the workplace, and that purport to be 'about subjects not related to his employment'—when his employer's 'legitimate and substantial interests' are 'compromised by his speech.' *Roe*, 543 U.S. at 81 . . . . In sum, to have a nexus to his employment, an employee's speech need not comment on the workings or functioning of the employer's operation; it is sufficient that that speech be detrimental to that operation.")

Thus, in this case, if Plaintiffs were intending to make an argument premised on Plaintiffs' speech being off-duty and non-work related, and if the Court were to embrace the distinction for off-duty, non-work-related speech noted in the Ninth Circuit's *Roe v. San Diego* decision, such a distinction would not change the outcome in this case. The outcome would not be impacted because the speech in this case would be considered "work related" because it impacts the Department's legitimate and substantial interests, similar to the plaintiff's speech in *Roe*. 543 U.S. at 84. To the extent Plaintiffs were attempting to imply some other legal argument, the Court has not divined what such argument might be and, therefore, cannot address it.

the Department, some of whom are—or have relatives who are—Muslim; (2) preventing distrust of officers among the community; (3) preventing officer actions that could dissuade Muslims from reporting crimes or assisting law enforcement; and (4) preventing friction between Muslims and officers who have served in the Military. (Doc. 17 at 8).

The Court gives wide deference to each of these reasons articulated by the Department for treating Plaintiff Hernandez's speech differently than a member of the general public. Moreover, testimony before this Court showed that the Department underwent a major disruption because of the fallout from the Plain View Project's dissemination of various officers' posts. (Doc. 26 at 102-103). From phone lines being flooded, to shutting down social media efforts to recruit additional officers, the Department's operations were hampered. (*Id*.). Even if the Court uses Plaintiff Hernandez's summary of the content of his posts, Plaintiff Hernandez's interest in discussing "assimilation" and "government spending" does not outweigh Defendants' interest in the efficient functioning of the Department, which was in fact disrupted by the speech underlying this case. Thus, Defendants have met their burden of showing that their interest in promoting efficiency in the public services the Department performs through its employees outweighs both Plaintiff Hernandez's interest in speaking and the public's interest (if any) in hearing the speech.

### c.    Conclusion: No Likelihood of Success on the Merits for Plaintiff Hernandez

Plaintiff Hernandez is not likely to succeed on the merits of his claim nor are there serious questions as to the merits because Plaintiff Hernandez did not speak on a matter of public concern. Alternatively, under *Pickering*, Defendants had an adequate justification for treating Plaintiff Hernandez's speech differently from a member of the general public. Finally, as noted in *Drake*, under *Pickering* if Plaintiff Hernandez cannot prevail on an as-applied challenge based on his prior behavior, the Court need not consider his facial challenge. 371 F. Supp. at 976.

### 3. AZCOPS — *NTEU*

#### a. Governing Law

To the extent AZCOPS is advancing an argument for an injunction against enforcement of the entire Social Media Policy[4] because it unconstitutionally chills prospective speech, Courts have recognized that any such claim must be made under a modified *Pickering* analysis. Specifically,

> The legal framework governing public employee speech claims is well known. Public employees may not "be compelled to relinquish the First Amendment rights they would otherwise enjoy as citizens to comment on matters of public interest." *Pickering v. Bd. of Educ.*, 391 U.S. 563 (1968). Underlying this principle is the recognition that "public employees are often the members of the community who are likely to have informed opinions as to the operations of their public employers." *City of San Diego v. Roe*, 543 U.S. 77, 82 (2004) (per curiam). Nonetheless, a citizen who accepts public employment "must accept certain limitations on his or her freedom." *Garcetti v. Ceballos*, 547 U.S. 410, 418 (2006). Government employers enjoy considerable discretion to manage their operations, and the First Amendment "does not require a public office to be run as a roundtable for employee complaints over internal office affairs." *Connick v. Myers*, 461 U.S. 138, 149 (1983).

> Courts begin the First Amendment inquiry by assessing whether the speech at issue relates to a matter of public concern. *See Pickering*, 391 U.S. at 568. If speech is purely personal, it is not protected and the inquiry is at an end. If, however, the speech is of public concern, courts must balance "the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Id.*; *see also Connick*, 461 U.S. at 142.
> . . .

> Here we deal with a broad social networking policy setting forth the parameters of public employee speech. In *United States v. Nat'l Treasury Employees Union (NTEU)*, 513 U.S. 454 (1995), the Supreme Court addressed how courts should apply *Pickering* when a generally applicable statute or regulation (as opposed to a post-hoc disciplinary action) operates as a prior restraint on speech. *NTEU* involved a statute that prohibited federal employees from accepting any compensation for giving speeches or writing articles, even when the topic was unrelated to the employee's official duties. *See id.* at 457. Emphasizing that the honoraria ban impeded a "broad category of expression" and "chills potential speech before it happens," the Court held that "the Government's burden is greater with respect to this statutory restriction on expression than with respect to [the] isolated disciplinary action[s]" in *Pickering* and its progeny. *Id.* at 467, 468. Accordingly, "[t]he

---

[4] The Court notes Defendants object to this construction of Plaintiff AZCOPS' argument because, as noted herein, Plaintiffs identify only one sentence of the six-page Social Media Policy as being potentially unconstitutional. (Doc. 17 at 11). Thus, Defendants argue that this identified sentence is the only sentence before the Court which the Court could enjoin, leaving the rest of the Social Media Policy in force.

Government must show that the interests of both potential audiences and a vast group of present and future employees in a broad range of present and future expression are outweighed by that expression's 'necessary impact on the actual operation' of the Government." *Id.* at 468 (quoting *Pickering*, 391 U.S. at 571). Further, the government "must demonstrate that the recited harms are real, not merely conjectural, and that the regulation will in fact alleviate these harms in a direct and material way." *Id.* at 475.

*Liverman v. City of Petersburg*, 844 F.3d 400, 406–07 (4th Cir. 2016).

Similarly, the District Court in Nevada articulated the test as:

A facial challenge to a public-employer's policy that creates a prospective restriction on speech is similar to a retaliation claim, but it assesses the policy's impact on all prohibited employee speech rather than merely the plaintiff's interest in the specific speech that resulted in his discipline. Courts thus apply a modified version of the *Pickering* framework. First, courts assess the policy's breadth by examining its text to determine "whether the restriction reaches speech on a matter of public concern, and . . . whether [it] reaches speech only within the scope of a public employee's official duties." Courts then look to the public employer's justification for the policy, weighing "the impact of the ban as a whole—both on the employees whose speech may be curtailed and on the public interested in what they might say—against the restricted speech's 'necessary impact on the actual operation' of the Government." ""Unlike an adverse action taken in response to actual speech,' a prospective restriction 'chills potential speech before it happens.' The government therefore must shoulder a heavier burden when it seeks to justify [a prospective] restriction as opposed to 'an isolated disciplinary action.'" Additionally, there must be a "close and rational relationship between the policy and legitimate government interests."

*Sabatini v. Las Vegas Metro. Police Dep't*, 369 F. Supp. 3d 1066, 1095–96 (D. Nev. 2019), *reconsideration denied*, 2019 WL 3307040 (D. Nev. July 23, 2019) (footnotes omitted).

**b.    Analysis**

While the Court recognizes that there may be a circumstance in which AZCOPS could obtain an injunction to prevent enforcement of the portions of the Social Media Policy they claim run afoul of the modified *Pickering* framework, Plaintiff AZCOPS has failed to make such a showing in this case. As discussed above, Plaintiffs made no arguments in their Amended Motion as to only AZCOPS' (or its members') prospective harm.

In their reply, Plaintiffs argue that the Social Media Policy would potentially encompass officers posting about the department or other topics that could be construed as matters of public concern. (Doc. 20 at 8). Plaintiffs also argue that the balancing of *Pickering* and its progeny weigh in AZCOPS' favor. (Doc. 20 at 8-11).

The test as articulated in *Liverman* is whether the speech targeted by the policy is on a matter of public concern, and if so, whether the employee's interest as a citizen in commenting on matters of public concern is outweighed by the government's interest in promoting efficient public services through its employees. 844 F.3d at 406. *Sabatini* applied this same test but added the question of whether the policy reaches speech made only within the scope of the public employee's office duties. 369 F. Supp. 3d at 1095-96.

As to the last prong from *Sabatini*, in this case it appears undisputed that the Social Media Policy reaches speech that is outside the scope of the employee's official duties; however, that speech impacted the employee's duties. Further, facially the policy would potentially reach speech that is a matter of public concern.[5]

Thus, the Court must consider whether the balancing test articulated in *Liverman* and *Sabatini* weigh in the members of AZCOPS' or Defendants' favor. As the Court discussed with respect to the *Pickering* balancing as applied to Plaintiff Hernandez, the Court finds that the Department's justifications for having the Social Media Policy to promote the efficient operation of the Department as a whole outweigh the employees' interest in commenting on certain matters of public concern. In other words, this Court agrees with the court in *Sabatini* that, "the policy formulaically prohibits only the types of speech that would tilt the *Pickering* balance in [the police department's] favor, [therefore] it is difficult to conclude that the policy as whole is overbroad." 369 F. Supp. 3d at 1096-97.[6]

Like the Court in *Sabatini*, this Court will next consider whether the one specific prohibition of the Social Media Policy identified by Plaintiffs as being unconstitutional is an acceptable regulation on employee speech under the *Pickering* balancing. Plaintiffs

---

[5] As discussed above, Plaintiff Hernandez cannot benefit from a facial challenge prospectively since he failed to prevail on an as-applied challenged based on his prior conduct. *See Drake*, 371 F. Supp. at 976. Moreover, Plaintiff Hernandez did not make himself available for the hearing in this case (Doc. 26 at 35-36) and, therefore, did not make any record on any future potential chilling effect on his speech.

[6] Again, as discussed in footnote 4 herein, the Court notes that Plaintiffs at best only vaguely made a challenge to the Social Media Policy as a whole. Nonetheless, the Court has considered this potential argument and rejected it.

- 19 -

identify the following prohibition as being unconstitutional: "Employees are prohibited from using social media in a manner that would cause embarrassment to or discredit the Department in any way." (Doc. 12 at 8-9, ¶ 9.A.(1)).

The Court in *Sabatini* next stated that it should construe any specific prohibition in the Social Media Policy within the context of the broader Social Media Policy and "consider whether the [policy] is 'readily susceptible' to a limiting construction that would render it constitutional." 369 F. Supp. 3d at 1097 (citing *Kroger*, 622 F.3d at 1208 (quoting *Virginia v. Am. Booksellers Ass'n*, 484 U.S. 383, 397 (1988)); *see also, e.g., Liverman*, 844 F.3d at 409 (addressing whether another provision in the social-media policy at issue could "narrow" the policy's reach).

In this case, the Court finds that that the preambles in Sections 9.A. and 9.B., as well as the language presumptively allowing free expression found in 9.B.(6), work together to provide a limiting construction rendering this restriction on speech constitutional under the modified *Pickering* balancing. For example, the preamble to 9.B. notifies the employees that Defendants are only targeting particular speech; specifically, "[p]ersonal social media activity must not interfere with work duties or the operation of the Department." The preamble to 9.A. further advises the employees, "Department personnel are cautioned their speech and related activity on social media sites may be considered a reflection upon their position, and, in some instances, this Department." Thus, the policy is limited to speech that would interfere with the work duties of the employee or the operation of the Department and that could be considered a reflection on the employee's position in the Department or the Department as a whole. Indeed, at the hearing on the preliminary injunction, Lieutenant Matthew Siekmann, the acting head of the PSB, testified that the Department does not punish officers for simply criticizing or making negative comments about the Department or its chief. (Doc. 26 at 112). Thus, the particular sentence of the Social Media Policy identified by Plaintiffs as potentially being unconstitutional, when taken in the broader context of the Social Media Policy as a whole, is subject to a limiting construction that renders it constitutionally permissible under the modified *Pickering*

balancing test. Thus, the Court will not issue an injunction in favor of AZCOPS on its facial challenge to the policy and its potential chilling effect on speech because Plaintiffs have failed to show serious questions going to the merits or a likelihood of success on the merits.[7]

### B. Irreparable Harm

Money damages often serve as a remedy at law in employment cases, thus preventing the need for the extraordinary equitable relief of a preliminary injunction. *See Sampson v. Murray*, 415 U.S. 61, 90 (1974). However, Plaintiffs argue that monetary damages alone will not suffice because Plaintiffs will have their future speech chilled by the Department's Social Media Policy while this case is pending. *See Elrod v. Burns*, 427 U.S. 347, 373 (1976).

As to Plaintiff Hernandez, if he is wrongfully disciplined, he can be made whole by money damages in the form of back wages. (Doc. 26 at 81). Further, because he cannot show he is likely to succeed on the merits or that there are serious questions going to the merits of his as-applied challenge, he cannot bring a facial challenge regarding a future chilling effect. Accordingly, Plaintiff Hernandez has not shown irreparable harm and his request for an injunction is denied for this alternative reason.

With respect to AZCOPS, as discussed above, Plaintiffs make a generalized argument that the Social Media Policy will have a chilling effect on speech. However, on this record, there is no testimony from particular members of AZCOPS regarding any speech they wished to make that they were chilled from making. *See Wooten v. BNSF Ry. Co.*, No. CV 16-139-M-DLC-JCL, 2017 WL 1066630, at *2 (D. Mont. Mar. 16, 2017), report and recommendation adopted, No. CV 16-139-M-DLC-JCL, 2017 WL 1089546 (D. Mont. Mar. 21, 2017) ("Even if [Plaintiff's] prediction is correct, such a future chilling effect would have no impact on the party seeking injunctive relief in this litigation. The irreparable harm analysis focuses on the harm to the party seeking injunctive relief, not on

---

[7] At the hearing on November 19, 2019, Plaintiffs' counsel also stated that Plaintiff AZCOPS was making an as-applied challenge to the Social Media Policy. (Doc. 26 at 51). However, Plaintiff AZCOPS made no factual or legal argument supporting this theory. Accordingly, relief on this basis is denied.

potential harm to third parties. *See Winter*, 555 U.S. at 20 ('A plaintiff seeking a preliminary injunction must establish . . . that *he is* likely to suffer irreparable harm in the absence of preliminary relief.') (emphasis added)"). In other words, generalized speculation that some police officers (who may or may not be members of AZCOPS) might have had their speech chilled is inadequate to show irreparable harm to a Plaintiff in this case.[8] Thus, AZCOPS has failed to establish an irreparable harm as to its members on this record.

### C. Balance of Equities

In deciding whether to enter a preliminary injunction, the Court considers the balance of equities between the parties. *Winter*, 555 U.S. at 20. Here, the *Pickering* balancing test already balances the equities between the parties. As to both Plaintiff Hernandez and Plaintiff AZCOPS, the Court has concluded that this balance favors Defendants. For these reasons, the balance of equities in this case favors Defendants.

### D. Public Interest

The public has a strong interest in hearing from police officers, especially about issues affecting the Department. However, as discussed above, Plaintiff Hernandez posts were not about matters impacting the Department; thus, the public interest does not favor him. Additionally, with respect to Plaintiff AZCOPS, there is no evidence in the record from Plaintiffs, nor legal argument from Plaintiffs, specific to the desire of members of AZCOPS to post about matters affecting the Department and whether that would run afoul of a particular portion of the Social Media Policy. Conversely, Lieutenant Matthew Siekmann testified that posts that were critical of the Department or its chief would not result in discipline under the Social Media Policy. (Doc. 26 at 112-113). Moreover, Defendants have identified a strong public interest in maintaining public trust and

---

[8] At the November 19, 2019 hearing, Lieutenant Thatcher testified that he received some inquiries about what is and is not permitted under the Social Media Policy. (Doc. 26 at 53-54). However, he did not specify whether those inquiries were from AZCOPS members, nor did he provide any specific testimony that a particular member of AZCOPS wished to make a specific post (that would be protected speech) and was chilled from doing so. (*Id.*). Moreover, for purposes of this Order, the Court has assumed that AZCOPS, as an entity, would have standing to represent all of its members in this case; however, neither party has briefed that issue and the Court has not substantively addressed it.

confidence in their Department. Accordingly, the public interest in this case weighs against granting an injunction.

**III. Conclusion**

To obtain a preliminary injunction, Plaintiffs must meet all four prongs of *Winter*. 555 U.S. at 20. Here, neither Plaintiff has met their burden of showing that they are likely to succeed on the merits or that there are serious questions going to the merits. Further, any discipline (including termination) against Plaintiff Hernandez is remediable by money damages; therefore, Plaintiff Hernandez cannot show irreparable harm. AZCOPS has not shown irreparable harm because it has not shown a chilling effect on a Plaintiff in this case. Additionally, the balance of equities favors Defendants. Finally, the public interest favors Defendants. Thus, Plaintiffs failed to meet all four prongs of *Winter*.

As a result,

**IT IS ORDERED denying** Plaintiffs' Amended Motion for a Preliminary Injunction (Doc. 12).

**IT IS FURTHER ORDERED** that Defendants must respond to Plaintiffs' complaint within 7 days. (Doc. 34).

Dated this 8th day of January, 2020.

*Michael T. Liburdi*

Michael T. Liburdi
United States District Judge