Stephen B. Coleman (State Bar #021715)
**PIERCE COLEMAN PLLC**
7730 East Greenway Road, Suite 105
Scottsdale, AZ 85260
Tel. (602) 772-5506
Fax (877) 772-1025
Steve@PierceColeman.com
*Attorneys for Defendants*

## UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| Juan Hernandez, individually and the Arizona Conference of Police and Sheriffs, an Arizona nonprofit corporation,<br><br>                    Plaintiffs,<br><br>          v.<br><br>The City of Phoenix, a municipal corporation; Jeri Williams, in her official capacity as Chief of Police of the Phoenix Police Department; and Shane Disotell, in his official capacity as the Commander of the Phoenix Police Professional Standards Bureau,<br><br>                    Defendants. | Case No: CV-19-05365-PHX-MTL<br><br>**DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' AMENDED COMPLAINT** |

Pursuant to Federal Rule of Civil Procedure 12(b)(6), Defendants City of Phoenix ("the City"), Jeri Williams ("Williams"), and Shane Disotell ("Disotell") (collectively, "Defendants") move to dismiss Plaintiffs' Amended Complaint ("FAC") for failure to state a claim upon which relief can be granted. Undersigned counsel certifies that the parties have conferred in good faith prior to the filing of this Motion, as required by this Court.

## **FACTUAL BACKGROUND**

Plaintiff Juan Hernandez is a Sergeant with the City's Police Department. [FAC at ¶ 9] He faces potential discipline based on inflammatory Facebook posts that demonstrate

religious bigotry and violate departmental policies.  [*Id.* at ¶ 51]

On or about June 1, 2019, a watchdog group called the Plain View Project ("PVP") released a collection of social media posts by Phoenix police officers to the public and media outlets, including several postings by Hernandez that reflected anti-Muslim sentiment.  [*Id.* at ¶¶ 26, 28]  On June 3, 2019, the Police Department's Professional Standards Bureau ("PSB") initiated an investigation of four Facebook postings by Hernandez that contained religiously insensitive material. [*Id.* at ¶ 35]

On September 30, 2013, Hernandez posted a picture with the following statement: "THE MOST COMMON NAME FOR A CONVICTED GANG RAPIST IN ENGLAND IS. . .  Muhammad[.]  Note to the British media – these gangs are not comprised of 'Asians'; they are Muslims."  [*Id.* at ¶ 17]  On October 8, 2014, Hernandez posted a joke about a taxi driver who kicked a Muslim passenger out of his vehicle and told him: "In the time of the prophet, there were no taxis, so piss-off and wait for a camel!"  [*Id.* at ¶ 18]  On December 24, 2013, Hernandez posted material ridiculing Islamic contributions to science. [*Id.* at ¶ 19]  Finally, on January 9, 2014, Hernandez posted an article entitled "Military Pensions Cut, Muslim Mortgages Paid by US!"  [*Id.* at ¶ 23]

In the course of the PSB investigation, Hernandez acknowledged that his Facebook account was publicly accessible at the time of the postings.  Hernandez also conceded that his Facebook account included pictures of him in his police uniform, such that he was identifiable as a Phoenix police officer.  [Exhibit 13 to FAC at pgs. 2, 9]

The PSB investigation concluded that Hernandez's postings violated the following departmental policies:

- Operations Order 3.27.9.B.(6), (New 08/13), which states, "Department personnel are free to express themselves as private citizens on social media sites to the degree that their speech does not impair working relationships of this Department, are detrimental to the mission and functions of the Department, that undermine respect or public confidence in the Department, cause embarrassment to the Department or City, discredit the Department or City, or undermine the goals and mission of the Department or City."
- Operations Order 1.1.2.B.(3), which states, "Responsibility and Respect: We respect and honor the inherent dignity of all people, including ourselves, and pledge fair and equal treatment for all."

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

[PSB Investigative Report, attached hereto as Exhibit A][1]

The PSB determined that Hernandez's conduct was a Class III violation, which may result in a demotion, and/or 40, 80, or 240-hour suspension, or termination of employment. [FAC at ¶¶ 42, 51]

In an attempt to deprive the City of the ability to discipline officers for improper conduct (such as Hernandez's bigoted posts), Plaintiffs are now challenging the constitutionality of the Police Department's social media policy and the PSB's investigative process.  As set forth below, Plaintiffs' efforts are unavailing because (1) Hernandez's speech was not on a matter of public concern; (2) the City's interest in regulating hateful, bigoted speech by a police officer outweighs any alleged protection under the First Amendment; (3) the social media policy comports with constitutional requirements; and (4) Plaintiffs have no valid challenge to the PSB investigation.

## ARGUMENT

**I.    THE *TWOMBLY/IQBAL* PLEADING STANDARD.**

Federal Rule of Civil Procedure 8 mandates that every complaint include sufficient facts to, at a minimum, "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 554 (2007).  The Supreme Court has stated that "[w]ithout some factual allegation in the complaint, it is hard to see how a claimant could satisfy the requirement of providing not only 'fair notice' of the nature of the claim, but also 'grounds' on which the claim rests."  *Id.* at 556 n.3.  Thus, "[w]hile a complaint attacked by a 12(b)(6) motion does not need detailed factual allegations, a plaintiff's obligation to provide the grounds for his entitlement to

---

[1] Plaintiff attached the PSB investigation report as Exhibit 20 to his original Complaint, but removed it from his Amended Complaint, perhaps in an attempt to deprive this Court of relevant facts that are detrimental to his claims.  Despite Plaintiff's efforts at obfuscation, this Court may consider the investigative report in deciding the this motion because it is a document upon which the Amended Complaint relies and the authenticity is not contested –- as confirmed by Plaintiff's earlier reliance on the report as an exhibit. *Parrino v. Fhp, Inc.*, 146 F.3d 699, 706 (9th Cir. 1998) (holding that a court "ruling on a motion to dismiss may consider a document the authenticity of which is not contested, and upon which the plaintiff's complaint necessarily relies").

3

relief requires more than labels and conclusions, and a formulaic recitation of the

elements of a cause of action will not do." *Id.* at 555 (internal quotations omitted).

The Supreme Court reaffirmed this heightened standard in *Ashcroft v. Iqbal*:

> *Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.* Although for the purposes of a motion to dismiss we must take all of the factual allegations in the complaint as true, *we are not bound to accept as true a legal conclusion couched as a factual allegation.* Rule 8 marks a notable and generous departure from the hyper-technical, code-pleading regime of a prior era, but it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions.

129 S. Ct. 1937, 1949-50 (2009) (emphasis added and internal quotations and parentheses

omitted). Therefore, to survive a motion to dismiss, a plaintiff must allege sufficient facts

to state a claim for relief "that is plausible on its face." *Id.* at 1949. As set forth below,

Plaintiff's Amended Complaint fails to meet this standard.

## II.    PLAINTIFFS' FIRST AMENDMENT CLAIMS ARE MERITLESS.

Hernandez, the Arizona Conference of Police and Sheriffs ("AZCOPS"), and Mark

Schweikert (collectively, "Plaintiffs") raise two challenges to the Police Department's

social media policy. First, they contest the constitutionality of the policy as applied to

Hernandez's Facebook postings. Second, they assert that certain portions of the

"PERSONAL USE" section of the policy are facially overbroad. The City will analyze

each theory separately.

### A.    The "As Applied" Challenged Is Barred By Law Of The Case.

At the preliminary injunction phase, this Court decided that Hernandez's speech

was not on a matter of public concern, and that any purported value was outweighed by

the City's interests under the Pickering balance. [Doc. 36 at 13-16] These

determinations were made as a matter of law based on the plain language of Hernandez's

postings. Therefore, the outcome cannot be changed by any factual supplementation. As

such, the "as applied" challenged is barred under the doctrine of "law of the case."

It is well-settled that "courts generally ... refuse to reopen what has been

decided...." *Magnesystems, Inc. v. Nikken, Inc.*, 933 F. Supp. 944, 948 (C.D. Cal. 1996)

4

This basic principle is referred to as the "law of the case."  *See* 18 Charles A. Wright, Arthur R. Miller, Federal Practice and Procedure § 4478 at 788 ("Law of the case rules have developed to maintain consistency and avoid reconsideration of matters once decided during the course of a single continuing lawsuit."); *Christianson v. Colt Indus. Oper. Corp.*, 486 U.S. 800, 816 (1988).  Under this doctrine, "[i]ssues decided at an earlier stage of the litigation, either explicitly or by necessary inference from the disposition of the issues, constitute the law of the case[,]" and should not be disturbed absent exceptional circumstances.  *Magnesystems,* 933 F. Supp. at 948.

To meet the "exceptional circumstances" requirement to justify a departure from the doctrine of law of the case, Plaintiffs must show that (1) there was an intervening change in controlling law; (2) new evidence has surfaced; or (3) the initial ruling resulted in clear error or manifest injustice.  *Id.* at 949.  None of these exceptions are applicable here, so the "as applied" challenge must fail.

**B.    Hernandez's Speech Was Not On A Matter Of Public Concern.**

Even setting aside the issue of "law of the case," Plaintiffs have not asserted a viable "as applied" claim.  In the Ninth Circuit, courts evaluate "as applied" First Amendment claims using the following five-step inquiry:  (1) whether the plaintiff spoke on a matter of public concern; (2) whether the plaintiff spoke as a private citizen or public employee; (3) whether the plaintiff's protected speech was a substantial or motivating factor in the adverse employment action; (4) whether the state had an adequate justification for treating the employee differently from other members of the general public; and (5) whether the state would have taken the adverse employment action even absent the protected speech.  *Eng v. Cooley*, 552 F.3d 1062, 1070 (9th Cir. 2009).

As an initial flaw with Plaintiffs' "as applied" challenge, Hernandez did not engage in protected speech on a matter of public concern.  The Ninth Circuit Court of Appeals has explained that for speech to address a matter of public concern:

> [T]he content of the [] speech must involve "issues about which information is needed or appropriate to enable the members of society to make informed decisions about the operation of their government."

> *McKinley*, 705 F.2d at 1114 (internal quotation marks and citation omitted); *see also Gillette v. Delmore*, 886 F.2d 1194, 1197 (9th Cir. 1989) (describing "matter[s] of political, social, or other concern to the community" as matters of public concern). "On the other hand, speech that deals with 'individual personnel disputes and grievances' and that would be of 'no relevance to the public's evaluation of the performance of governmental agencies' is generally not of 'public concern.'" *See Coszalter v. City of Salem*, 320 F.3d 968, 973 (9th Cir. 2003) (*quoting McKinley*, 705 F.2d at 1114); *see also Connick*, 461 U.S. at 154 (stating that speech limited to "an employee grievance concerning internal office policy" is unprotected). The same is true of "speech that relates to internal power struggles within the workplace," and speech which is of no interest "beyond the employee's bureaucratic niche."

*Desrochers v. City of San Bernardino*, 572 F.3d 703, 711 (9th Cir. 2009).

The Ninth Circuit has also recognized that:  "In a close case, when the subject matter of a statement is only marginally related to issues of public concern, the fact that it was made because of a grudge or other private interest or to co-workers rather than to the press may lead the court to conclude that the statement does not substantially involve a matter of public concern."  *Id.* at 709-10.

Here, Hernandez's posts did nothing to inform the public about any aspect of the City's functioning or operations.  Instead, his speech is more properly characterized as relating to a personal grudge or other private interest.

By illustration, the joke that Hernandez posted on October 8, 2014 did not contain any discussion of matters of social or political importance, but rather mocked and ridiculed people of Islamic faith by suggesting that a Muslim should ride a camel because there were no taxis in the time of the prophet.  This can hardly be construed as speech on a matter of public concern.  *See Sabatini v. Las Vegas Metro. Police Dep't*, 369 F. Supp. 3d 1066, 1084 (D. Nev. 2019) (cartoon showing a person amused at a suicide attempt was "merely a crass attempt at humor" and not speech on a matter of public concern).  Hernandez's post mocking Muslim contributions to science is likewise lacking in a discernable political or social message.  Instead, Hernandez's speech, once again, constitutes a denigrating attack on people of Islamic faith.  Similarly, the post identifying Muhammad as the most common name of a gang rapist in the UK serves to perpetuate a

6

negative view of Muslims, rather than foster discourse on issues of public significance.[2]

In light of the foregoing, this Court correctly reached the following conclusion regarding the unprotected nature of Plaintiff's speech, which remains binding:

> Although the form of Plaintiff Hernandez's communications weigh in favor of them being of public concern, the most important factor—content—does not. Further, the context of the posts also weighs against the posts being matters of public concern. Therefore, the Court finds Plaintiff Hernandez's speech was not on a matter of public concern.

[Doc. 36 at 13] This determination, by itself, is fatal to Hernandez's "as applied" claim.

## C.   The *Pickering* Balance Weighs Heavily In Favor Of The City.

Even if Hernandez's speech touched on a matter public concern (which it did not), the City is still entitled to prevail under the *Pickering* balance.  Regardless of how Hernandez's postings are construed, there can be no debate that the Police Department's interest in maintaining order and harmony outweighed any alleged protected interest Hernandez may have had in disseminating derogatory content targeted at Muslims.

Government employers are empowered to regulate speech that is disruptive to the management of personnel and internal affairs.  *See, e.g., Connick v. Myers*, 461 U.S. 138, 146-148 (1983).  Thus, as part of the analysis of a First Amendment claim, courts must perform a balancing test to determine whether the interest of the government employer "in promoting the efficiency of the public services it performs through its employees" outweighs the employee's interests, as a citizen, "in commenting upon matters of public concern."  *Pickering v. Bd. of Educ.*, 391 U.S. 563, 568 (1968).  Relevant considerations in this balancing test are "whether the statement impairs discipline by superiors or harmony among co-workers, has a detrimental impact on close working relationships for which personal loyalty and confidence are necessary, or impedes the performance of the speaker's duties or interferes with the regular operation of the enterprise."  *Rankin v. McPherson*, 483 U.S. 378, 388 (1987); *see also Brewster v. Board of Educ.*, 149 F.3d 971, 979 (9th Cir. 1998) (government has "wide discretion and control over the management of

---

[2] While Hernandez now attempts to characterize his posts as part of a debate on assimilation, the Court must look to what "employees actually said, not what they say they said after the fact."  *Desrochers*, 572 F.3d at 711.

[] personnel and internal affairs [including] the prerogative to remove employees whose conduct hinders efficient operation and to do so with dispatch."). The *Pickering* balance is a question of law to be resolved by the Court. *Connick*, 461 U.S. at 148 n.7 (1983).

When applying the *Pickering* balance, courts give substantial deference to a governmental entity's judgment in making personnel decisions concerning police officers. *Aguilera v. Baca*, 510 F.3d 1161, 1171 (9th Cir. 2007) ("[Police] are entitled to deference, within reason, in the execution of policies and administrative practices that are designed to preserve and maintain security, confidentiality, internal order, and esprit de corps among their employees."); *Cochran v. City of Los Angeles*, 222 F.3d 1195, 1201 (9th Cir. 2000) ("Discipline and esprit de corps are vital to [police department's] functioning. Given that 'a wide degree of deference to the employer's judgment is appropriate' when 'close working relationships are essential to fulfilling public responsibilities,' the balance of interests tips in favor of the City."); *Kannisto v. City and County of San Francisco*, 541 F.2d 841, 843 (9th Cir. 1976) (same).  When this deference is properly applied, the inescapable conclusion is that Hernandez's speech was unprotected.

On Hernandez's side of the equation, he is seeking protection for speech that denigrates members of the Islamic faith (including mocking their beliefs and culture); perpetuates anti-Muslim sentiments; and attempts to breed animosity between veterans and Muslims.  These matters, even if protected (which they are not), do not reside at the core of the First Amendment.

Indeed, courts have repeatedly found that a plaintiff's right to engage in racist off-duty speech is outweighed by a public employer's interest in a harmonious work environment and a positive relationship with the public. *See, e.g., Locurto v. Guiliani*, 447 F.3d 159, 180 (2nd Cir. 2006) (rejecting First Amendment claim where police officers were terminated based on concerns that their speech would cause the public, and particularly members of minority communities, to regard the police department as racist); *Pappas v. Giuliani*, 290 F.3d 143, 145, 151 (2nd Cir. 2002) (holding that the plaintiff's

right to anonymously distribute "offensive racially bigoted materials" was outweighed by his employer's interest "in promoting the efficiency of the public service it performs"); *Spetalieri v. Kavanaugh*, 36 F.Supp.2d 92, 100, 106 (N.D.N.Y. 1998) (even assuming the plaintiff's off-duty speech in which he spoke "in a denigrating manner about African-Americans" touched on a matter of public concern, the "potential for disruption in the" police department "outweighs the value of [the] plaintiff's speech"). The same reasoning applies to bigoted speech that is targeted at Muslims.

In contrast to the limited (and likely non-existent) value of Hernandez's speech, the City has an overwhelming interest in preserving order, harmony, and discipline within the Police Department. There is perhaps no more important governmental function than to protect the safety of its citizens. Hernandez's purported right to post anti-Muslim material is dwarfed by the City's compelling interests in regulating disruptive speech.

Importantly, "in executing the *Pickering* balance, courts should not require government employers to demonstrate that the employee's speech actually disrupted efficient office operation; rather, 'reasonable predictions of disruption' are sufficient." *Moran v. Washington*, 147 F.3d 839, 846 (9th Cir. 1998). Here, the consequences of Hernandez's speech are easy to recognize.

Police officers are held to the highest level of integrity, and it is critically important for the Police Department to have a positive and trusting relationship with the public in order to provide effective law enforcement services. Furthermore, it is crucial for police officers to trust their colleagues, since they may be required to rely upon them for back-up in potentially life-threatening situations. Against this backdrop, Hernandez's postings can be reasonably expected to: (1) create discord between members of the Police Department who must work together closely to perform important public safety functions, including those who are Muslim or have family, friends, or loved ones who practice the Islamic faith; (2) create distrust of the Police Department among the general public; (3) discourage Muslims from reporting crimes or cooperating with law enforcement; and (4) create

friction between police officers who are military veterans and members of the Islamic community.  Based on these concerns alone, the Court should conclude that the *Pickering* balance weighs strongly in favor of the City.

Even though reasonable predictions of disruption would be sufficient for the City to prevail, the Court need not rely solely on the mere possibility that Hernandez's postings could cause public mistrust and discredit to the Police Department. Indeed, the material publicized by the PVP (which included Hernandez's bigoted postings) resulted in a cascade of negative publicity.  [*See* Exhibit A at p. 2, attached hereto]

As the Ninth Circuit has expressly recognized, police officers are charged with preserving the integrity and image of the department, and therefore, speech that results in public denigration of the agency loses its protection.  *See Dible v. City of Chandler*, 515 F.3d 918, 928-29 (9th Cir. 2008).  These precise circumstances exist here, as demonstrated by the public's response to the postings.

In sum, Hernandez's speech is worthy of no protection, as previously decided by this Court. In contrast, the City's interests are strong enough to not just tip the balance in its favor, but to break the scale. Thus, this Court properly concluded that "Defendants have met their burden of showing that their interest in promoting efficiency in the public services the Department performs through its employees outweighs both Plaintiff Hernandez's interest in speaking and the public's interest (if any) in hearing the speech." [Doc. 36 at 16] For this additional reason, Hernandez's "as applied" claim must fail.

### D.    Plaintiffs Cannot Succeed On Their Facial Challenge.

Plaintiffs' facial challenge to the social media policy is unavailing.  In assessing a preemptive attack on a restriction on speech, courts apply a modified version of the *Pickering* framework.  *Sabatini*, 369 F. Supp. 3d at 1090.  First, courts assess the policy's breadth by examining its text to determine "whether the restriction reaches speech on a matter of public concern."  *Id.*; *see also Field Day, LLC v. Cty. of Suffolk*, 463 F.3d 167, 174 (2d Cir. 2006) ("A 'facial challenge' to a statute considers only the text of the statute itself, not its application to the particular circumstances of an individual.").  Courts then

look to the public employer's justification for the policy, weighing "the impact of the ban as a whole—both on the employees whose speech may be curtailed and on the public interested in what they might say—against the restricted speech's 'necessary impact on the actual operation' of the Government."  *Id.*  In applying this test, the Court must consider the challenged provision in the context of the broader policy, and, if possible, apply a limiting construction to avoid a finding of unlawfulness.  *Virginia v. Am. Booksellers Ass'n*, 484 U.S. 383, 397 (1988); *Sabatini*, 369 F. Supp. 3d at 1097 (courts must construe a challenged provision "in the context of the broader social-media policy and 'consider whether the [policy] is 'readily susceptible' to a limiting construction that would render it constitutional'").

Here, assuming arguendo that the social media policy reaches speech on a matter of public concern, the restrictions are justified based on the overwhelming need to promote efficiency, order, and discipline within the Police Department.

Plaintiffs attempts to challenge certain parts of the "PERSONAL USE" section in a vacuum, but ignore the overall context.  [FAC at ¶¶ 70-74]  When the "PERSONAL USE" section of the social media policy is examined as a whole, the context makes clear that it is intended to balance an employee's right to engage in protected speech against the disruption to the Police Department, with the end result being that the policy only restricts speech when the balance tips in the City's favor.  By illustration:

- Section 3.27.9(A) begins with the following prefatory statement:  "Department personnel are cautioned their speech and related activity on social media sites may be considered a reflection upon their position, and, in some instances, this Department."  This general guidance, which provides context for the policy, is in line with the Ninth Circuit's observation that police officers have a duty to safeguard the image of the department.  *Dible*, 515 F.3d at 928-29.  [Exhibit 3 to FAC at pgs. 5-6]
- Sections 3.27.9(A)(2) and 9(A)(3) state that "Employees are responsible for their social media postings if they are found to be in violation of any City or Department policy" and "Employees may not use social media to harass, discriminate, bully, retaliate, etc."  These restrictions are appropriately targeted at speech that impairs relationships, erodes public trust, or otherwise violates an independent City policy.  [*Id.*]
- Section 3.27.9(B) of the social media policy is prefaced with the following statement:  "Personal social media activity must not interfere with work duties or the operation of the department."  This makes clear that there must be some nexus between the speech and an employee's job for the restrictions to apply, thus

limiting the reach of the policy.  [*Id.*]

- Section 3.27.9(B)(6) explicitly recognizes that police officers are "free to express themselves as private citizens on social media sites to the degree that their speech does not impair working relationships of the Department, are detrimental to the mission of and functions of the Department, that undermine respect or public confidence in the Department, cause embarrassment to the Department or City, discredit the Department or City, or undermine the goals and mission of the Department or City." This largely aligns with the factors relevant to the *Pickering* balance, and disproves Plaintiffs' erroneous contention that the City does not weigh the employees' interests.  [*Id.*]

As previously noted, in deciding the question of overbreadth, the Court must consider whether the policy is "readily susceptible" to a limiting construction that would render it constitutional.  *Powell's Books, Inc. v. Kroger*, 622 F.3d 1202, 1208 (9th Cir. 2010).  When looked at in totality, the social media policy involves an appropriate balancing of both sides' interests and imposes restrictions only if (1) the employee's speech impacts the workplace; and (2) the disruption to the organization and/or impairment to relationships outweighs any constitutional protection.

The decision in *Sabatini* is instructive on this issue.  There, the police department adopted a social media policy stating that employees "are free to express themselves as private citizens in matters of public concern" as long as their speech doesn't "[i]mpair working relationships," "[i]mpede the performance of duties," "[i]mpair discipline and harmony among coworkers," or "[n]egatively impact or tend to impact the department's ability to serve the public" – a restriction that is similar in scope to the City's policy.  369 F. Supp. 3d at 1096.  The court reasoned that "[b]ecause the policy formulaically prohibits only the types of speech that would tilt the *Pickering* balance in Metro's favor, it is difficult to conclude that the policy as whole is overbroad."  *Id.* at 1096-97.

The court then considered one particular facet of the challenged policy:  a prohibition on "speech that ridicules, maligns, disparages, or otherwise promotes discrimination against race, ethnicity, religion, sex, national origin, sexual orientation, age, disability, political affiliation, gender identity and expression or other explicit class of individuals. . . ."  *Id.* at 1097.  The *Sabatini* court acknowledged that this language may reach some protected speech, but recognized the duty to assess the plaintiff's challenge "in

12

the context of the broader social-media policy" and to consider whether the provision "is 'readily susceptible' to a limiting construction that would render it constitutional." *Id.*

The court concluded that the policy was appropriately restricted in scope because it does "not prohibit [] employees from speaking on matters of department policy or actions and from thus bringing to light what 'ails' the community's police force. Nor does the policy prohibit employees from commenting on any particular topic, related or unrelated to the employee's work. Rather, the policy's objective--repeated throughout its text--is to prevent its employees from posting content online that would impair its ability to function by, among other things, eroding the public's trust in the department." *Id.* at 1099. By the same token, the Police Department's social media policy does not ban criticism of the organization or prohibit commentary on particular subjects. Instead, the policy only regulates speech that is detrimental to the Police Department's operations.

Finally, the *Sabatini* court found that the defendant had a compelling justification for the social media policy, explaining that:

> Metro has a strong interest in maintaining public trust by prohibiting speech that would cause the public to question its ability to "enforce[] the law fairly, even-handedly, and without bias." And although a prospective restriction on speech requires a greater showing than post-hoc discipline, I find that Metro's interest still satisfies this higher burden because public faith in the fair, unbiased administration of public institutions—especially the criminal-justice system—is fundamental to our democratic society. That trust is eroded by police-officer speech that "ridicules, maligns, disparages, or otherwise promotes discrimination against race, ethnicity, religion, sex," etc. Accordingly, there is a "close and rational relationship" between Metro's interest in preserving the public's trust and its social-media policy, which is tailored to prohibit speech that Metro has a legitimate and overriding interest in prohibiting under the *Pickering* framework. The plaintiffs' overbreadth prospective-restriction claims therefore fail.

*Id.* Likewise, the City has an equally compelling reason for prohibiting speech that impairs relationships, disrupts operations, or brings discredit to the Police Department. Under the reasoning from *Sabatini*, the policy must survive Plaintiffs' facial challenge. Thus, the Court correctly denied Plaintiffs' request to enjoin enforcement of the social media policy and, under the same reasoning, should dismiss Plaintiffs' facial challenge.[3]

---

[3] In the Amended Complaint, Plaintiff asserts that the social media policy was applied in an overly broad manner to warn officers for posting bible verses, political cartoons, and

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### III.    THE PEACE OFFICER BILL OF RIGHTS CLAIM DOES NOT EXIST.

For Count II of the Amended Complaint, Plaintiffs alleged that Defendants violated Arizona's peace officers bill of rights ("Bill of Rights"),  A.R.S. § 38-1101 *et seq*., which governs the process by which law enforcement officer misconduct is investigated and disciplined and establishes an administrative right of appeal for certain disciplinary actions.  *See* A.R.S. §§ 38-1101 to 1106, 1110.

Plaintiffs allege that there were irregularities in the investigation into Hernandez's conduct, and that the range of proposed discipline (which has not yet been adjudicated), is not reasonably related to the seriousness of the offense.  The Bill of Rights, however, does not contemplate or provide for judicial review of an investigation.  Nor does it allow a peace officer to bypass the administrative appeal process and seek immediate judicial review of a proposed disciplinary action.  Instead, the Bill of Rights establishes a statutory remedy for procedural violations – exclusion of evidence at the appeal hearing, unless the violation resulted from excusable neglect. A.R.S. § 38-1106(D). The reviewing authority is vested with the power to determine if a violation occurred, and what the consequence should be.  A.R.S. § 38-1106(D), (E), and (L).  Moreover, the Bill of Rights tasks the reviewing authority (not the courts) with conducting an appeal hearing and determining whether just cause existed for a challenged disciplinary action.  A.R.S. § 38-1106(K).

The Bill of Rights expressly grants a right of judicial review in only two narrow circumstances, neither of which applies here.  First, if on appeal an independent board or hearing officer recommends reinstating or otherwise rejecting the demotion or termination of a law enforcement officer, and the final decision maker rejects that recommendation, the officer has a right to *de novo* review of that decision in superior court.  A.R.S. § 38-1107(A).  Second, a law enforcement officer who is employed by an agency that has no

logos.  [FAC at ¶ 10]  These allegations are irrelevant because (1) the affected officers are not parties to this case, so there is no basis for an "as applied" challenge; and (2) facial challenges are assessed based exclusively on the text of the policy, and not the manner in which the policy is applied. *Accord Field Day*, 463 F.3d 167, 174 (2d Cir. 2006) ("A 'facial challenge' to a statute considers only the text of the statute itself, not its application to the particular circumstances of an individual."); *Smith ex rel. Smith v. Mount Pleasant Pub. Sch.*, 285 F. Supp. 2d 987, 991 (E.D. Mich. 2003) (same).

administrative review mechanism in place may bring an action in superior court for *de novo* review of the disciplinary action against him or her.  A.R.S. § 38-1107(B).

Here, Hernandez has not been disciplined, much less exhausted the administrative appeal process.  Moreover, both A.R.S. § 38-1107(A) and (B) are inapplicable because the City allows employees in the classified service to appeal suspensions, demotions, and terminations to the Civil Service Board, and the decision of the Civil Service Board is final.  [*See* Phoenix Personnel Rules 19-22, attached as Exhibit B][4]  Thus, there is no basis for Plaintiffs to assert a claim under the Bill of Rights.

Finally, to the extent Hernandez alleges deficiencies in the processes afforded him, the statute contains no private right of action. *Hinchey v. Horne*, No. CV13-00260-PHX-DGC, 2013 WL 4543994, at *12 (D. Ariz. Aug. 28, 2013) (the peace officer bill of rights "does not appear to provide for a private right of action"). Thus, any deficiencies are simply a matter for consideration by the administrative decision maker in ruling on the appeal – a process that has not yet occurred. And to the extent that Hernandez is dissatisfied with the outcome of any post-disciplinary appeal hearing, he can seek a special action review.  *Woerth v. City of Flagstaff*, 167 Ariz. 412 (Ariz. Ct. App. 1990). Therefore, Count II alleging a violation of the Bill of Rights is baseless.[5]

## IV.    DUE PROCESS DID NOT APPLY AT THE INVESTIGATIVE PHASE.

Throughout Counts I and III, Plaintiffs make several vague references to alleged violations of procedural due process during the City's investigation of Hernandez's conduct.  Plaintiffs' allegations are insufficient to state a facially plausible claim because there is no right to due process at the investigative phase.

A Section 1983 claim based upon procedural due process has three elements: "(1) a

---

[4] The Court can properly consider the Personnel Rules as a public record. *Biggs v. Town of Gilbert*, No. CV11-330-PHX-JAT, 2011 WL 1793252, at *3, n.4 (D. Ariz. May 11, 2011) ("[T]he Court can take judicial notice of the public Town of Gilbert Personnel Rules[.]").

[5] Count II also alleges violations of the right to free speech under the Arizona Constitution. This purported claim fails for the same reasons as Count I under the First Amendment. *Iglesias v. City of Goodyear*, No. CV 11-01891-PHX-FJM, 2013 WL 623576, at *2 (D. Ariz. Feb. 20, 2013) ("In Arizona, the analysis regarding whether speech is protected under the state constitution is consistent with First Amendment case law.").

liberty or property interest protected by the Constitution; (2) a deprivation of the interest by the government; and (3) lack of process." *Portman v. County of Santa Clara*, 995 F.2d 898, 904 (9th Cir. 1993).  In the employment context, due process requires that a tenured employee receive notice of the proposed grounds for discipline and an opportunity to be heard.  *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 544-45 (1985).  In other words, the right to pre-termination due process is not triggered until there is a proposed deprivation of a protected right; otherwise, the employee's property interest in continued employment is not implicated.  Accordingly, courts have rejected due process claims that challenge an employer's investigation of an employee's misconduct, rather than the procedures utilized in connection with the actual deprivation.  *See Tonkovich v. Kansas Bd. of Regents*, 159 F.3d 504, 523 (10th Cir. 1998) ("[T]he fact that University administrators conducted an investigation without Professor Tonkovich's knowledge does not implicate procedural due process because he ultimately received notice of the charges and a meaningful opportunity to respond in the hearing. . . ."); *Derstein v. Kansas*, 915 F.2d 1410 (10th Cir. 1990) ("The fact that Derstein may not have known in advance about Van Buren's internal investigation, did not receive more facts or a copy of the transcript at the pretermination hearing is not significant."); *Cadorna v. City & County of Denver*, No. 04CV01067-REBCBS, 2006 WL 1659064, at *2 (D. Colo. June 8, 2006) ("Although plaintiff describes his pre-termination due process claims as involving defendant's allegedly faulty and biased investigation of the charges against him, such allegations do not implicate constitutional due process rights."); *Ramirez-De Leon v. Mujica-Cotto*, 345 F. Supp. 2d 174, 188 (D.P.R. 2004) ("[I]nvestigations conducted by administrative agencies, even when they may lead to criminal prosecutions, do not trigger due process rights[;] there must also be an adjudication.") (citation omitted). Indeed, this Court recently agreed that "allegations of a biased pre-termination investigation do not implicate constitutional due process rights." *McClarty v. Tolleson*, No. CV-16-00065-PHX-DJH at p. 10 (D. Ariz. Sep. 16, 2016). Therefore, any due process claim should be dismissed.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**V.      COUNT III (UNCONSTITUTIONAL AND/OR UNLAWFUL CUSTOMS, POLICIES, AND FAILURE TO TRAIN) IS NOT A STAND-ALONE CLAIM.**

For Count III of the Amended Complaint, Plaintiffs allege that Defendants are liable for "unconstitutional and/or unlawful customs, policies and failure to train." However, this is not a stand-alone cause of action, but rather a method for imputing liability to a municipality for an unlawful action.  *See Flores v. Cty. of Los Angeles*, 758 F.3d 1154, 1158-59 (9th Cir. 2014) (holding that to establish municipal liability, a plaintiff must show that the defendant was "deliberately indifferent to the need to train subordinates, *and the lack of training actually caused the constitutional harm or deprivation of rights*") (emphasis added); *Farkas v. State of Nevada Dep't of Corr.*, No. 214CV00451JADVCF, 2016 WL 3397418, at *1, n. 2 (D. Nev. June 14, 2016) ("Custom and policy is not a stand-alone § 1983 claim, but rather a theory for imposing municipal liability under § 1983."); *McLean v. Pine Eagle Sch. Dist., No. 61*, 194 F. Supp. 3d 1102, 1113 (D. Or. 2016) (concluding that "there is no freestanding 'failure to train' claim under the Fourteenth Amendment (or any other constitutional provision)"); *Rogers v. City of Winnsboro, Texas*, No. 6:15-CV-003-MHS-KNM, 2016 WL 8730189, at *8 (E.D. Tex. July 8, 2016) ("Adopting or implementing careless and reckless policies, customs, or practices, however, is not a standalone claim under § 1983, but instead, is a means for establishing municipal liability based on an underlying constitutional violation by a municipal employee."); *Romero v. Bd. of Cty. Commissioners for the Cty. of Curry*, 202 F. Supp. 3d 1223, 1267 (D.N.M. 2016) "(Defendants are correct that the *Monell* claim is not a separate, stand-alone claim 'for the failure by the government to train its employees; it extends liability to a municipal organization where that organization's failure to train, or the policies or customs that it has sanctioned, led to an independent constitutional violation.'")  On this basis alone, Count III must fail.

<u>**CONCLUSION**</u>

For the reasons set forth above, Defendants respectfully request that this Court enter an Order dismissing the Amended Complaint in its entirety.

RESPECTFULLY SUBMITTED this 6th day of April 2020.

**PIERCE COLEMAN PLLC**

By /s/ Stephen B. Coleman
    Stephen B. Coleman
    7730 E. Greenway Road, Ste. 105
    Scottsdale, Arizona 85260
    *Attorneys for Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that on April 6, 2020, I electronically transmitted the attached document to the Clerk's Office using the ECF System for filing and caused a copy to be electronically transmitted to all ECF registrants:

Steven J. Serbalik
**STEVEN J. SERBALIK, P.L.C.**
4925 East Desert Cove Avenue #116
Scottsdale, Arizona  85254
*Attorneys for Plaintiffs*

By:  /s/Karen M. Chenowth

4817-5908-2936, v. 1