**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Juan Hernandez, et al., | No. CV-19-05365-PHX-MTL |
| Plaintiffs, | **ORDER** |
| v. | |
| City of Phoenix, et al., | |
| Defendants. | |

Pending before the Court is Defendants the City of Phoenix, Chief of Police Jeri Williams, and Commander Shane Disotell's (collectively, "Defendants") Motion to Dismiss Plaintiffs Juan Hernandez ("Hernandez"), Mark Schweikert ("Schweikert"), and the Arizona Conference of Police and Sheriffs' ("AZCOPS"; collectively, "Plaintiffs") First Amended Complaint ("FAC"). (Doc. 48). Plaintiffs have responded, (Doc. 54), and Defendants have replied, (Doc. 55). The Court now rules on the motion.

## I.      BACKGROUND

Hernandez and Schweikert are two Phoenix police officers and members of the AZCOPS organization, which is "dedicated to fair representation of law enforcement officers around the State of Arizona." (Doc. 47-1 at 3). Claiming that the Phoenix Police Department's (the "Department") Social Media Policy (the "Policy") abridges their freedom of speech, the three seek an injunction to prevent the Department from enforcing the Policy in addition to money damages for the alleged deprivation of their constitutional rights. (*Id.* at 16).

As the Court explained in its prior order, Hernandez faces potential discipline for violating the Policy. (Doc. 36 at 3–5). The alleged violations center around four Facebook posts from 2013 and 2014 that came to the Department's attention when the Plain View Project, a group that maintains a database of police officer's social media posts in furtherance of "a national dialogue about police," publicized them and other posts in 2019. (*Id.* at 4; Doc. 47-1 at 5 (quotations omitted)). The publicized posts for which Hernandez faces discipline are:

> (1) September 30, 2013: A meme with what appears to be mugshots of men of Middle Eastern descent and containing the text "THE MOST COMMON NAME FOR A CONVICTED GANG RAPIST IN ENGLAND IS . . . Muhammad Note to the British media – these gangs are not comprised of 'Asians'; they are Muslims."

> (2) October 8, 2013: A meme entitled "You just got to love the Brits" recounting a story in which a Muslim taxi passenger asked the driver to turn off the music in the car for religious reasons, to which the driver responded "[i]n the time of the prophet, there were no taxis, so piss-off and wait for a camel!"

> (3) December 24, 2013: A meme entitled "RECENT CONTRIBUTIONS TO SCIENCE BY ISLAM" in which Muslim scholars and theologians expressed controversial opinions regarding female drivers, DNA testing in rape cases, the Earth revolving around the Sun, and the link between dressing modestly and earthquakes.

> (4) January 9, 2014: Article entitled "Military Pensions Cut, Muslim Mortgages Paid by US!"

(Doc. 36 at 2–3).  The release of Hernandez and other officers' social media posts resulted in negative media attention from several local news outlets. (Doc. 48-1 at 3 (collecting stories)). Soon after, the Department launched an investigation, led by Commander Disotell, that concluded Hernandez violated the following provision of the Policy:

> Department personnel are free to express themselves as private citizens on social media sites to the degree that their speech does not impair working relationships of this Department, are detrimental to the mission and functions

of the Department, that [sic] undermine respect or public confidence in the Department, cause embarrassment to the Department or the City, discredit the Department or City, or undermine the goals and mission of the Department or City.

(*Id.* at 9). Commander Disotell's report concluded that Hernandez had violated this provision of the Policy because the "overwhelming media coverage" following the Plain View Project's release of the posts "resulted in major reputation damage to the . . . Department," "could potentially spread fear and hatred towards people of Middle Eastern descent, as well as those practicing the Muslim faith," had eroded public trust in the police, and would make presenting in-court testimony more complicated. (Doc. 48-1 at 9). Accordingly, the report recommended referral to the Department's Disciplinary Review Board. (*Id.* at 10).

Before his disciplinary review hearing could take place, Hernandez and AZCOPS filed a complaint and a motion for a preliminary injunction in this Court to stave off any potential discipline, asserting that the Policy was unconstitutional on its face and as-applied to Hernandez. (Docs. 1 & 12). In ruling on that motion, as relevant here, the Court concluded that Plaintiffs had not shown a likelihood of success on the merits for their as-applied challenge at that stage because the four posts that the Department concluded had violated the Policy did not touch on matters of public concern and, even assuming that they did, Defendants' interest in regulating Hernandez's speech outweighed his interest in speaking it. (Doc. 36 at 6). As for Plaintiffs' facial challenge, which sought to enjoin enforcement of the entire Policy to vindicate the rights of AZCOPS members, the Court concluded that Plaintiffs had also not shown a likelihood of success on the merits because the Policy was "limited to speech that would interfere with the work duties of the employee or the operation of the Department." (*Id.* at 20). Therefore, the Court denied Plaintiffs' motion for a preliminary injunction.

Plaintiffs have since filed an amended complaint to add Schweikert as a party. (Doc. 47). Although Schweikert does not face any impending discipline, he alleges that the mere existence of the Policy has caused him to "limit[] his commentary on politics, religion, and

[other] newsworthy topics . . . because he fears that Defendants will take disciplinary action against him." (Doc. 54 at 2). The pending motion to dismiss under Federal Rule of Civil Procedure ("Rule") 12(b)(6) soon followed.

## II.   LEGAL STANDARD

When a claim either lacks a cognizable legal theory or alleges insufficient facts under a cognizable legal theory, the Court must grant a motion to dismiss for failure to state a claim. *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1990). Only a complaint that satisfies Rule 8(a)(2)'s requirement of "a short and plain statement of the claim showing that the pleader is entitled to relief," will survive a Rule 12(b)(6) motion. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Although Rule 8 "does not require 'detailed factual allegations,'" it requires "more than an unadorned, the defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 555). In other words, the complaint must plead sufficient facts to "state a claim for relief that is plausible on its face." *Id.* (quoting *Twombly*, 550 U.S. at 570). A complaint shows facial plausibility when it pleads factual content that allows a court to draw reasonable inferences as to the defendant's liability. *Id.* But when "a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of 'entitlement to relief.'" *Id.* (quoting *Twombly*, 550 U.S. at 557). In sum, "the pleading must state 'enough fact[s] to raise a reasonable expectation that discovery will reveal evidence of [the misconduct alleged]." *Cafasso v. Gen. Dynamics C4 Sys., Inc.*, 637 F.3d 1047, 1055 (9th Cir. 2011) (alterations in original) (quoting *Twombly*, 550 U.S. at 556).

In ruling on the motion, the Court must accept as true all well-pleaded factual allegations. *Iqbal*, 556 U.S. at 679. Pleadings that offer no more than legal conclusions, however, are not entitled that assumption. *Id.*

## III.   ANALYSIS

### A.   Issues Not Properly Before the Court

Before turning to the grounds raised in Defendants' motion to dismiss, the Court

must note that Defendants' reply brief argues for the first time that the FAC does not adequately plead that the Policy is void for vagueness. (Doc. 55 at 7–9). "It is well established in this circuit that courts will not consider new arguments raised for the first time in a reply brief." *Surowiec v. Capital Title Agency, Inc.*, 790 F. Supp. 2d 997, 1002 (D. Ariz. 2011) (quoting *Bach v. Forever Living Prods. U.S., Inc.*, 474 F. Supp. 2d 1110, 1122 n.6 (W.D. Wash. 2007)). Because Defendants waited until the reply brief to raise this issue, they have deprived Plaintiffs of any opportunity to respond. Therefore, the Court will not consider this argument.

In addition, Defendants' motion sought dismissal of what it described as "several vague references to alleged violations of procedural due process during the City's investigation of Hernandez's conduct." (Doc. 48 at 15). In their response, Plaintiffs stated that "[t]he lack of due process is actionable as it relates to Plaintiffs' free speech claims." (Doc. 54 at 11 n.7). Reviewing the allegations in the FAC confirms that Plaintiffs have not raised a separate due process claim; instead, their assertions that Defendants' followed an improper process in disciplining Hernandez all relate to their free speech claims. (*E.g.*, Doc. 47-1 at 12 ¶ 79). Thus, the Court will not address Defendant's arguments that Plaintiffs has not sufficiently pleaded a procedural due process claim, because the FAC has not raised any such claim.[1]

B.      **Law of the Case**

The Court first addresses Defendants' contention that Hernandez's as-applied challenge is barred by the law of the case. (Doc. 48 at 4). Specifically, Defendants assert

---

[1] The Court notes, however, that these allegations are based off the mistaken assumption that the First Amendment requires a government employer to analyze various factors before it can terminate an employee for speech. (Doc. 54 at 11 n.7). Plaintiffs cite no case supporting the novel proposition that a public employer must balance its own interests against those of an employee who it seeks to terminate prior to termination. Indeed, from the beginning, the Supreme Court has made clear that the relevant First Amendment principles should be applied after the fact by a court. *See Connick v. Myers*, 461 U.S. 138, 142 (1983) ("*Our task*, as we defined it in *Pickering*, is to seek 'a balance between the interests of the [employee], as a citizen in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees.'" (quoting *Pickering v. Bd. of Educ.*, 391 U.S. 563, 568 (1968)) (emphasis added) (alteration in original). Plaintiffs' arguments that rely on this mistaken assumption necessarily fail.

that the Court's decision on the legal question whether Hernandez's Facebook posts touched on a matter of public concern at the preliminary injunction phase is now binding going forward. (Doc. 55 at 2). Plaintiffs respond that the Court's prior order presents no bar to Hernandez's as-applied challenge because issues decided in "rulings on preliminary injunctions do not constitute binding law of the case." (Doc. 54 at 3).

"The law-of-the-case doctrine generally provides that 'when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case.'" *Musacchio v. United States*, 136 S. Ct. 709, 716 (2016) (quoting *Pepper v. United States*, 562 U.S. 476, 506 (2011)). It does not "bar a court from reconsidering its own orders before judgment is entered or the court is otherwise divested of jurisdiction." *Askins v. U.S. Dep't of Homeland Sec.*, 899 F.3d 1035, 1042 (9th Cir. 2018). "The 'general rule' is that 'decisions on preliminary injunctions are not binding . . . and do not constitute the law of the case.'" *Chinatown Neighborhood Ass'n v. Harris*, 33 F. Supp. 3d 1085, 1093–94 (N.D. Cal. 2014) (quoting *S. Or. Barter Fair v. Jackson County*, 372 F.3d 1128, 1136 (9th Cir. 2004)). After all, the preliminary injunction inquiry calls on the Court to make "predictions . . . as to the likely outcome on the merits" on an often-incomplete factual record. 18B Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice and Procedure* § 4478.5 (2d ed. 2020 Update).

Not a single case that Defendants cite supports the notion that the Court's prior prediction on the likely outcome of Hernandez's as-applied claim is binding going forward. Rather, each of these cases describes the exception to the general rule regarding the effect of preliminary injunctions: After an appeal from a preliminary injunction order, any of the appellate court's conclusions on pure issues of law become law of the case going forward. *Ranchers Cattleman Action Legal Fund United Stockgrowers of Am. v. U.S. Dep't of Agric.*, 499 F.3d 1108, 1114 (9th Cir. 2007); *All. for the Wild Rockies v. Pena*, No. 2:16-CV-294-RMP, 2018 WL 4760503, at *10 (E.D. Wash. Oct. 2, 2018) (applying the law of the case "established by the Ninth Circuit's decision on Alliance's Motion for Preliminary Injunction"); *Lone Star Sec. & Video, Inc. v. City of Los Angeles*, 989 F. Supp. 2d 981, 989

(C.D. Cal. 2013) ("[T]he Court applies the law-of-the-case doctrine and finds that the ordinances have already been deemed content-neutral by both this Court and the Ninth Circuit."); *Magnesystems, Inc. v. Nikken, Inc.*, 933 F. Supp. 944, 949 (C.D. Cal. 1996) ("[T]his case presents a specific and more binding variant of the law of the case doctrine— the so-called 'mandate' rule."). Therefore, the Court will not apply the law-of-the-case doctrine to bar Hernandez's as-applied challenge at this time.

Although the Court is not necessarily bound by its prior order, neither can the Court cast its earlier reasoning aside whole cloth. Plaintiffs certainly have not asked the Court to reconsider its prior order, and the Court does not independently see any reason to change its prior legal conclusions. Thus, at this stage, if the allegations in the FAC do nothing to change the legal conclusions that the Court has previously reached, even assuming their truth, then the Court finds that it should continue to adhere to its prior rulings. In other words, where those allegations compel the same conclusions, the FAC fails to state a claim to relief that is plausible on its face.

## C.    First Amendment Claims

### 1.    General Principles

"[A] public employee does not relinquish First Amendment rights to comment on matters of public interest by virtue of government employment." *Connick v. Myers*, 461 U.S. 138, 140 (1983). The Supreme Court has nonetheless recognized that the government "has interests as an employer in regulating the speech of its employees that differ significantly from those it possesses in connection with regulation of the speech of the citizenry in general." *Pickering v. Bd. of Educ.*, 391 U.S. 563, 568 (1968). Accordingly, it has formulated a unique test that seeks "to arrive at a balance between the interests of [a public employee], as a citizen, in commenting upon matters of public concern and the interests of the [government], as an employer, in promoting the efficiency of the public services it performs through its employees." *Id.* If the speech in question does not relate to a public concern, however, a court need not perform this balancing. *Connick*, 461 U.S. at 146. Stated differently, such speech is not "covered" by the First Amendment and the Court

does not even run the *Pickering* balancing test to determine if the speech is "protected." *Moran v. State of Wash.*, 147 F.3d 839, 848 (9th Cir. 1998) (citing Frederick Schauer, *Public Figures*, 25 Wm. & Mary L. Rev. 905, 932 n.113 (1984) ("That which is covered [by the First Amendment] is not necessarily protected, but coverage ensures that a court will test the reasons for restriction against first amendment standards.")).

For the same reasons that a different test is required for individual personnel decisions, courts have also developed a unique test to evaluate a government employer's broadly applicable speech-regulating policies. *Moonin v. Tice*, 868 F.3d 853, 861 (9th Cir. 2017).[2] The first step of this test "focus[es] on the text of the policy to determine the extent to which it implicates public employees' speech as citizens speaking on matters of public concern." *Id.* If the policy reaches speech on matters of public concern, the Court must "weigh[] the impact of the ban as a whole—both on the employees whose speech may be curtailed and on the public interested in what they might say—against the restricted speech's 'necessary impact on the actual operation of the Government.'" *Id.* (quoting *United States v. Nat'l Treasury Emps. Union (NTEU)*, 513 U.S 454, 465–68 (1995)) (internal quotations omitted). Because such a policy has a greater chilling effect on speech than an individual personnel decision, the government's burden is necessarily greater and the analysis "more closely resembles exacting scrutiny than the traditional *Pickering* analysis." *Janus v. Am. Fed. of State, Cty., & Mun. Emps.*, 138 S. Ct. 2448, 2472 (2018). It is nonetheless clear that this somewhat more exacting scrutiny does not prevent a government employer from imposing rules on its employees that would certainly not pass muster when applied to the public at large. *City of San Diego v. Roe*, 543 U.S. 77, 80 (2004) (per curiam).

## 2.    First Amendment Retaliation

Defendants argue that the as-applied challenge necessarily fails because Hernandez's own allegations indicate he did not engage in speech on a matter of public

---

[2] In this context, courts often use the term "prior restraint" as a helpful shorthand for speech restricting policies of a government employer, but such claims distinct from the archetypal prior restraint cases that arise in the licensing context. *Id.* at 857 n.1.

concern. (Doc. 48 at 5). Specifically, they argue that Hernandez's posts are "more properly characterized as relating to a personal grudge or other private interest" and more akin to a crass attempt at humor. Proceeding from the premise that speech need not be employment-related to touch on a matter of public concern, Hernandez counters that his Facebook posts touched on a matter of public concern because (1) they discussed "quintessential matters of public concern, including the nature of media coverage, cultural assimilation, and spending priorities of the federal government"; (2) the posts related to matters that "were being widely discussed on social media at that time"; and (3) some of the posts were by definition newsworthy because the underlying quotes received news attention. (Doc. 54 at 4–5) (record citations omitted).

Speech is of public concern when it "is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public at the time of publication." *Roe*, 543 U.S. at 84. "Whether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole record." *Connick*, 461 U.S. at 147–48. Of these factors, "content is king." *Johnson v. Poway Unified School Dist.*, 658 F.3d 954, 965 (9th Cir. 2011). Although the public concern element includes a broad array of speech, "there are limits. 'In a close case, when the subject matter of a statement is only marginally related to issues of public concern, the fact that it was made because of a grudge or other private interest or to co-workers rather than to the press may lead the court to conclude that the statement does not substantially involve a matter of public concern.'" *Desrochers v. City of San Bernardino*, 572 F.3d 703, 709 (9th Cir. 2009) (quoting *Johnson v. Multnomah County,* 48 F.3d 420, 425 (9th Cir. 1995)). "Plaintiff bears the burden of showing that the speech addressed an issue of public concern." *Eng v. Cooley*, 552 F.3d 1062, 1070 (9th Cir. 2009).

The Court first addresses Hernandez's general premise that the content of the speech need not be employment related to touch on a matter of public concern. (Doc. 54 at 4–5). Surely, this is generally a correct statement of law. Issues of significant religious or political import have been held to touch on a matter of public concern. *See, e.g.*, *Snyder v.*

1    *Phelps*, 562 U.S. 443, 454 (2011) (holding that protesters' signs, even if inartful, touched

2    on a matter of public concern where they addressed "the political and moral conduct of the

3    United States and its citizens, the fate of our Nation, homosexuality in the military, and

4    scandals involving the Catholic clergy"); *Rankin v. McPherson*, 483 U.S. 378, 381–87

5    (1987) (police constable spoke on a matter of public concern when she stated "if they go

6    for him again, I hope they get him" on the heels of an attempt on the president's life and in

7    the course of a discussion about the president's policies); *Melzer v. Bd. of Educ.*, 336 F.3d

8    185, 196 (2d Cir. 2003) ("Advocacy for a change in public perception and law, a

9    fundamental component of democracy, is certainly a matter of public concern, regardless

10   of the subject matter."); *Tucker v. State of Cal. Dep't of Educ.*, 97 F.3d 1204, 1210 (9th

11   Cir. 1996) ("[R]eligious expression . . . is obviously of public concern."). At bottom,

12   however, whether employment-related or not, speech on a matter of public concern is

13   speech that is essential to our democratic system of self-government. *Connick*, 461 U.S. at

14   145; *Hyland v. Wonder*, 972 F.2d 1129, 1138 (9th Cir. 1992).

15        Not all speech that merely touches on topics "of public importance," however,

16   "address[es] a matter of public concern as that term is used in *Connick*." *Kokkinis v.

17   Ivkovich*, 185 F.3d 840, 844 (7th Cir. 1999). "[A] simple reference" to a topic of public

18   importance, "'incidental to the message conveyed' weighs against a finding of public

19   concern." *Desrochers*, 572 F.3d at 711 (quoting *Robinson v. York* 566 F.3d 817, 823 (9th

20   Cir. 2009)). And the "mere insertion of a scintilla of speech regarding a matter of public

21   concern" cannot be allowed to "plant the seed of a constitutional case." *Graziosi v. City of

22   Greenville Miss.*, 775 F.3d 731, 739 (5th Cir. 2015) (first quoting *Teague v. City of Flower

23   Mound*, 179 F.3d 377, 382 (5th Cir. 1999); and then quoting *Connick*, 461 U.S. at 149).

24   Indeed, that is why the Court must also look to content and form, particularly in close cases.

25   *Multnomah County*, 48 F.3d at 425.

26        In view of the foregoing, Hernandez's arguments that flow from his general premise

27   do little aid to him in fending off the motion to dismiss because the Court has already

28   decided that, at best, any messages conveyed in his Facebook posts touched only lightly on

matters of public concern. (Doc. 36 at 10). Hernandez's claim that he was commenting on "the nature of media coverage, cultural assimilation, and spending priorities of the federal government" has already been rejected as contrary to the true content of the Facebook posts. (*Id.* at 11–12). At best, any message related to those topics was incidental to the primary thrust of his posts, which contained little more than animus and "crass attempt[s] at humor." *Sabatini v. Las Vegas Metro. Police Dep't*, 369 F. Supp. 3d 1066, 1084 (D. Nev. 2019). While it is clear that social and political advocacy touches on a matter of public concern no matter how insensitively stated, *Snyder*, 562 U.S. at 454, there is no indication of such advocacy in the true content of Hernandez's Facebook posts, *Roe v. City & County of San Francisco*, 109 F.3d 578, 585 (9th Cir. 1997) ("If Roe's letter had stated just that, his argument would be stronger. However, such a reading is not to be found in his missive."). As the Court emphasized in its prior order, the inquiry focuses on what Hernandez "actually said, not what [he] say[s] [he] said after the fact." *Desrochers*, 572 F.3d at 711. In the end, his characterization of his posts as commentary on broader social issues is simply contrary to the actual language he chose to employ.

Furthermore, it is clear Hernandez's argument regarding the per se newsworthiness of the content of his Facebook posts based on contemporary news stories discussing those topics, (*see* Doc. 47-3 at 47–53), must be rejected. Setting aside the fact that, as discussed, his posts touched on these topics in only a limited sense, such a test would completely erode *Connick*'s three-factor analysis. In fact, taken to its endpoint, Hernandez's proposal would render the content of public-employee speech—the most important factor in the analysis—irrelevant in many cases because a Court would only have to see if any news outlet (regardless of how reputable) had mentioned the topic before. Hernandez cites no authority for this novel proposition and the Court's independent research has not revealed any. Rather, the cases have emphasized that when a public employee's speech is reported by the press it is "almost by definition a 'matter of public concern,'" *Roe*, 109 F.3d at 585 (citation omitted), something that most often occurs when a public employee seeks to use the press to inform the public about his office's inefficiency, wrongdoing, or other breach

of the public's trust, *Connick*, 461 U.S. at 148.[3]

Turning to the remaining two factors of the *Connick* inquiry, the Court likewise finds that neither the allegations in the FAC nor any arguments that Hernandez makes in his response compel the Court to reach a different conclusion than it did in its prior order. In fact, the allegations in the FAC undercut any claim that the form of his speech would support a finding of public concern. For instance, Plaintiff alleges that, despite being public, his posts remained online for years before the Plain View Project published them without anyone making an issue of their inflammatory nature. (Doc. 47-1 at 5). Thus, while the mere fact that Hernandez used Facebook to express himself would generally weigh in favor of a finding of public concern, *cf. Packingham v. North Carolina*, 137 S. Ct. 1730, 1737 (2017) (analogizing social media to "the modern public square" and describing it as "perhaps the most powerful mechanism[] available to a private citizen to make his or her voice heard"), his activity is notably less public than, say, a mayor's public "Facebook page [that] served as a community bulletin board upon which members of the . . . community could lobby . . . or apprise members of the community of events occurring in the town or things of general interest," *Graziosi*, 775 F.3d at 739; *see also Desrochers*, 572 F.3d at 714 ("We have recognized . . . that '[a] limited audience weigh[s] against [a] claim of protected speech.'" (citation omitted)) (alteration in original).

In this close case, the Court concludes that Hernandez's speech did not substantially involve a matter of public concern such that the First Amendment does not cover the speech and the *Pickering* balancing test does not come into play. *Desrochers*, 572 F.3d at 710 (quoting *Multnomah County*, 48 F.3d at 425). The subject matter of the speech relates only marginally to an issue of public importance; the posts express Hernandez's personal hostility towards Muslims and their beliefs, without attempting to bring to light any malfeasance or governmental inefficiency; and, while he spoke on social media, he did not address himself to a large audience. In close cases like this, courts can also consider the

---

[3] This observation also has a bearing on both the form and context factors. *See McKinley*, 705 F.2d at 1114 ("The result in *Connick* is also explained by the fact that the employee did not seek to inform the public about the operation of a public agency.") (internal quotation and citation omitted).

policy concerns that *Connick* articulated. *Desrochers*, 572 F.3d at 718–19. To presume that all expressions of religious animus posted on social media are matters of public concern would mean "virtually every [such] remark . . . would plant the seed of a constitutional case." *See Connick*, 461 U.S. at 149. As the Second Circuit Court of Appeals has noted, that conclusion "would lead to the somewhat anomalous result that the Government would have far *less* latitude to dismiss an employee for a *public* display of racism involving public concerns than it has for, say, speech that was uttered in the privacy of the employee's bedroom . . . ." *Locurto v. Giuliani*, 447 F.3d 159, 174–75 (2d Cir. 2006).

For these reasons, the Court concludes that Hernandez did not speak on a matter of public concern. Therefore, the Court need not engage in *Pickering* balancing. Accordingly, Hernandez's as-applied challenge will be dismissed with prejudice.

###### iii.   Prior Restraint

Defendants next argue that Plaintiffs' "facial" challenge cannot succeed because even if provisions of the Policy reach matters of public concern, the Court has already found that the Policy's scope is both justified and susceptible to a limiting construction. (Doc. 48 at 10–12). Plaintiffs, relying primarily on *Livermore v. City of Petersburg*, 844 F.3d 400, 408–09 (4th Cir. 2016), contend that they have stated a plausible claim for relief on their facial challenge because the Policy subjects all Department officers to discipline "for an astonishing breadth" of speech. (Doc. 54 at 8).

Although an employee can make an as-applied challenge to a government employer's speech-regulating policy, *see NTEU*, 513 U.S. at 477–78 & n.26, Plaintiffs have brought a facial challenge here.[4] An enactment can be facially unconstitutional in two ways: "either because it is unconstitutional in every conceivable application, or because it

---

[4] Courts and commentators have recognized that, while *NTEU* blurred the line between facial and as-applied challenges, it is more akin to an as-applied challenge based on the Supreme Court's remedy. *Sanjour v. EPA*, 56 F.3d 85, 92–93 & n.10 (D.C. Cir. 1995) (en banc) (distinguishing *NTEU* from First Amendment overbreadth doctrine and explaining that it is perhaps best characterized as an "as applied challenge to a broad category of [speech]" that largely elides the distinction between the two categories of claims); *see also* Richard H. Fallon Jr., *As-Applied and Facial Challenges and Third-Party Standing*, 113 Harv. L. Rev. 1321, 1343 (2000) (discussing *NTEU*).

seeks to prohibit such a broad range of protected conduct that it is unconstitutionally 'overbroad.'" *Members of the City Council of the City of Los Angeles v. Taxpayers for Vincent*, 466 U.S. 789, 796 (1984). "In the First Amendment context . . . a law may be invalidated as overbroad if 'a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep.'" *United States v. Stevens*, 559 U.S. 460, 473 (2010) (quoting *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 449 n.6 (2008)). Because the modified *Pickering* balancing test articulated in *NTEU* controls the constitutionality of policies like the one at issue here, Plaintiffs' burden is to show that the Policy flunks that test in at least a substantial number of its applications. *See Legal Aid Servs. of Or. v. Legal Servs. Corp.*, 608 F.3d 1084, 1096 (9th Cir. 2010) (explaining that the underlying constitutional standard remains the same regardless of whether the plaintiff brings a facial or as-applied challenge).

Under *NTEU*, Courts employ a similar test to *Pickering* balancing to assess the constitutionality of a public employer's prior restraint on employees' speech. As compared to a post hoc personnel decision, however, the government must shoulder a heavier burden to justify a prior restraint such that the analysis "more closely resembles exacting scrutiny." *Janus*, 138 S. Ct. at 2472. A court must begin by examining the text of the policy to determine "the extent to which it implicates public employees' speech as citizens speaking on matters of public concern." *Moonin*, 868 F.3d at 861. If so, then the Court proceeds to determine if the government has proffered legitimate justifications for the restriction that outweigh the interests of public employees in speaking, and citizens in hearing, the restricted speech. *Barone v. City of Springfield*, 902 F.3d 1091, 1104 (9th Cir. 2018). This balancing test includes a tailoring requirement, meaning the government's interest will be less weighty where the restraint does not bear a close and rational relationship to furthering the recited interest. *NTEU*, 513 U.S. at 475 (explaining that the government must demonstrate that the regulation "will in fact alleviate [the recited] harms in a direct and material way"); *Moonin*, 868 F.3d at 867; *Sanjour v. EPA*, 56 F.3d 85, 98 (D.C. Cir. 1995) (en banc) ("If the government has a substantial interest with respect to only a subcategory

of the restricted speech, then its interest will not readily outweigh the burden imposed on the larger category of speech subject to regulation.").

"Application of the overbreadth doctrine . . . is, manifestly, strong medicine" and should be avoided "when a limiting construction has been or could be placed on the challenged statute." *Broadrick v. Oklahoma*, 413 U.S. 601, 613 (1973). Thus, if the Court concludes that the plain language of the Policy sweeps too broadly, it must consider if it is readily susceptible to a limiting construction that would render it constitutional. *Powell's Books, Inc. v. Kroger*, 622 F.3d 1202, 1215 (9th Cir. 2010). In doing so, the Court cannot "insert missing terms into the statute or adopt an interpretation precluded by the plain language of the ordinance." *Id.* (quoting *Foti v. City of Menlo Park*, 146 F.3d 629, 639 (9th Cir. 1998)).

To support the claim that the Policy is overly broad, the FAC focuses on the following five provisions of the Policy:

> (1) When using social media, Department personnel should be mindful their speech becomes part of the worldwide electronic domain. Therefore, adherence to City and Department policies is required in the personal use of social media. Employees are prohibited from using social media in a manner that would cause embarrassment to or discredit the Department in any way.

> (2) Employees are prohibited from posting on any network or internet site any photographs, video or audio recordings taken on Department property and/or in the performance of official duties (including official Department training, activities, or work specific assignments) that are detrimental to the mission and functions of the Department, that undermine respect or public confidence in the Department, could cause embarrassment to the Department or City, discredit the Department or City, or undermine the goals and mission of the Department or City.

> (3) Department personnel are free to express themselves as private citizens on social media sites to the degree that their speech does not impair working relationships of this Department are detrimental to the mission and functions of the Department, that undermine respect or public confidence in the Department, cause embarrassment to the Department or City, discredit the Department or City, or undermine the goals and mission of the Department or City.

(4) Department personnel may not divulge information gained while. In the performance of their official duties; make any statements, speeches, appearances, and endorsements where the employee is acting or appearing to act in an official capacity or as an official representative of the Department or City; or publish materials that could reasonably be considered to represent the views or positions of this Department without express authorization.

(5) For safety and security reasons, Department personnel are cautioned not to disclose their employment with this Department. As such, Department personnel are cautioned not to:

- Display Department logos, uniforms, or similar identifying items on personal web pages.

- Post personal photographs or provide similar means of personal recognition that may cause them to be identified as an employee of this Department.

(Docs. 47-1 at 10–11; 47-3 at 10–11). In their response, Plaintiffs specifically identify the language in these provisions that prevents dissemination of speech on social media that would embarrass or discredit the Department as the source of the constitutional dilemma in this case. (Doc. 54 at 6).

To be sure, such language can sometimes be problematic. In *Barone v. City of Springfield*, for example, the plaintiff sought to challenge the provision of a prior restraint that banned "any negative speech about City or Department misconduct except for reporting police 'discrimination or profiling.'" 902 F.3d at 1102. The court rejected the government's interest in efficiency as an adequate justification for that prohibition, stating:

[T]he Department may be more efficient if the public holds a positive view of the Department and the City, and preventing any negative or disparaging speech about both the City and the Department would help maintain that positive view. However, maintaining efficiency through "avoidance of accountability" and limiting "inquiry into [its] practices by the public," is not an acceptable justification in a democratic society.

*Id.* (citations omitted). The court found further constitutional flaws in the prior restraint

because it failed to "cabin[] the bar to certain subject matters," was not "limited to employment-related speech, . . . [or] speech that reasonably could cause a disruption at the Department," and the "focus on only 'disparaging or negative' speech render[ed] the [prior restraint] a posterchild of overt viewpoint discrimination." *Id.* at 1105–06 (citations omitted); *see also Moonin*, 868 F.3d at 867 (even crediting the police department's interest in avoiding disruption, the prior restraint was not justified where it failed to distinguish between speech that could reasonably be expected to disrupt its operations "and speech that plainly would not, or that would do so only inasmuch as it engendered legitimate public debate"); *Liverman v. City of Petersburg*, 844 F.3d 400, 408 (4th Cir. 2016) (holding that policy language forbidding officers from posting negative information about the department on social media could not withstand scrutiny under *NTEU* absent "evidence arising from plaintiffs'—or any other officer's comments on social media").

The Policy at issue in this case, however, is different from those that could not withstand constitutional scrutiny in the above cited cases. Instead of a flat ban on speech criticizing the Department, the Policy provides broad guidance on social media conduct with a special focus on conduct that will disrupt the Department's operations. In fact, this Court's prior order found that the other provisions Plaintiffs cite "formulaically prohibit[] only the types of speech that would tilt the *Pickering* balance in [the Department's] favor, [therefore] it is difficult to conclude that the policy as a whole is overbroad." (Doc. 36 at 19 (quoting *Sabatini*, 369 F. Supp. 3d at 1096–97). Consequently, unlike the problematic policy in *Barone*, the Policy distinguishes between categories of speech that could reasonably be expected to disrupt operations and does not impermissibly invite viewpoint discrimination by focusing on only disparaging or negative speech. Put otherwise, this Court has essentially already found that, although the Policy reaches some speech on matters of public concern, the Policy would not fail the modified *Pickering* balancing test as to a substantial amount of that speech.

Moreover, to the extent it is even necessary to apply one, the Court has also already found that the Policy is readily susceptible to a limiting construction that would avoid any

constitutional issue. The Court found this limiting construction in the prefatory language of certain provisions that presumptively allow free speech and, perhaps even more importantly, language that instructed personnel that "their speech and related activity may be considered a reflection upon their position and, in some instances, this Department." (Doc. 47-3 at 10). So construed, the Policy does not preclude an officer from making negative comments about the Department or its chief, (Doc. 36 at 20), meaning that it affords employees the breathing space to engage in speech that would not disrupt police operations, "or that would do so only inasmuch as it engendered legitimate public debate." *Moonin*, 868 F.3d at 867. And it would thus extend only to the kind of expressive conduct that courts have recognized law enforcement agencies have a compelling interest in preventing in order to preserve the public trust. *See Barone,* 902 F.3d at 1105–06 (citing *Dible v. City of Chandler*, 515 F.3d 918, 928 (9th Cir. 2008) and recognizing law enforcement agencies' interest in stopping "indecent public activities" that undermine the respect of the agency, lead to denigration, and diminished potential recruits); *see also Locurto*, 447 F.3d at 178–79 ("Police officers and firefighters alike are quintessentially public servants. As such, part of their job is to safeguard the public's opinion of them, particularly with regard to a community's views of the respect that police officers and firefighters accord the members of that community."). Because the Policy is readily susceptible to a limiting construction, the Court cannot hold it to be facially overbroad.

Accordingly, as was true for Hernandez's as-applied claim, the Court's prior order is largely controlling. Because nothing in the FAC nor Plaintiffs' response changes the Court's earlier analysis on the facial challenge, the FAC fails to state an overbreadth claim on which Plaintiffs may plausibly recover. Therefore, the Court finds that the facial claim must be dismissed with prejudice.

### D.    Article 2, Section 6 of the Arizona State Constitution

Defendants next argue that, for the same reasons, Plaintiffs have not stated a claim on which they may recover under Article 2, Section 6 of the Arizona State Constitution, which guarantees that "[e]very person may freely speak, write, and publish on all subjects,

being responsible for the abuse of that right." (Doc. 48 at 15 n.5). Plaintiffs respond only with the broad assertion that Article 2, Section 6 is more speech protective than even the First Amendment but do not explain why that broader protection demands that different standards apply to their state and federal constitutional claims. (Doc. 54 at 9 (quoting *Brush & Nib Studio, LC v. City of Phoenix*, 448 P.3d 890, 902 ¶ 45 (Ariz. 2019)). While Arizona's courts have indeed stated that the text of Article 2, Section 6 is more speech-protective than the First Amendment, they "have often relied on federal case law in addressing free speech claims under the Arizona Constitution." *Brush & Nib Studio, LC*, 484 P.3d at 903 ¶ 46. Thus, consistent with other courts in this district, the Court concludes that the same standards govern their state and federal free speech claims. *See, e.g.*, *Iglesias v. City of Goodyear*, No. CV 11-01891-PHX-FJM, 2013 WL 623576, at *2–3 (D. Ariz. Feb. 20, 2013) (applying *Pickering* and its progeny under Article 2, Section 6). Therefore, because Plaintiffs failed to state a claim on which they may recover under federal law, they have also failed to do so under state law.

### E. Peace Officer's Bill of Rights

Defendants next argue that Plaintiffs' claim under the Arizona Peace Officer's Bill of Rights must be dismissed because it "does not contemplate or provide for judicial review of an investigation." (Doc. 48 at 14). They also contend this claim is premature, because Hernandez has not been disciplined and, as such, the administrative appeals process within the Department has not yet occurred. (*Id.*). Plaintiffs generally respond that the Department violated the Peace Officer's Bill of Rights provision requiring it to inform him "of the possible disciplinary action resulting from [his] conduct . . . such that [he] should have reasonably known the action would occur." (Doc. 54 at 10). They do not, however, address the judicial review portions of the statute and they dispute neither the fact that Plaintiff has not been disciplined nor the existence of an appeals process within the Department (*Id.*).

Whether the FAC states a cognizable claim under the Peace Officer's Bill of Rights begins and ends with the text of the statute. Arizona Revised Statutes § 38-1107 authorizes judicial review in two instances. First, a demoted or terminated employee has a right to a

de novo review of his termination where the law enforcement agency reversed "the decision or recommendation of a hearing officer, administrative law judge or appeals board . . . stat[ing] that there was no just cause for the demotion or termination." § 38-1107(A). Second, "where there is no hearing officer, administrative law judge, or appeals board to review the demotion or termination, the law enforcement officer may bring an action . . . to review the agency's file." § 38-1107(B). Because the FAC does not allege that Hernandez has been terminated or demoted, (Doc. 47-1 at 14) (describing the disciplinary actions complained of as "proposed"), neither section applies. *Hinchey v. Horne*, No. CV13-00260-PHX-DGC, 2013 WL 4543994 (D. Ariz. Aug. 28, 2013) (dismissing a claim for failure to articulate a cognizable legal theory on this basis).

Because no provision of the Peace Officer's Bill of Rights authorizes a private right of action under the facts as alleged, the Court will dismiss this claim with prejudice.

**F.    *Monell***

Count III of the FAC asserts that the City of Phoenix and Chief Williams's failure to train Commander Disotell, the officer who prepared Hernandez's disciplinary report, "amounted to a deliberate indifference to the rights of persons with whom . . . Disotell came into contact with, including . . . Hernandez" (Doc. 47-1 at 15). Defendants seek dismissal of Count III, asserting that "this is not a stand-alone cause of action, but rather a method of imputing liability to a municipality for an unlawful action." (Doc. 48 at 17). Although Defendants are correct that *Monell* is a theory of liability, "as a practical matter, such a claim must be separately stated and have its own identity." *Fredenburg v. County of Santa Clara*, C 07-04412 JW, 2010 WL 11639785, at *8 (N.D. Cal. Sept. 24, 2010). In fact, to comply with Rule 8, a complaint must separately allege the different factual predicates underlying a claim. *See Pena v. Taylor Farms Pacific, Inc.*, 2014 WL 1330754, at *4–5 (E.D. Cal. Mar. 28, 2014) (discussing *Pickern v. Pier 1 Imports (U.S.), Inc.*, 457 F.3d 963 (9th Cir. 2006) and *Coleman v. Quaker Oats*, 232 F. 3d 1271 (9th Cir. 2000)). Therefore, the allegations relating to the City of Phoenix's failure to train Commander Disotell—which appear only in Count III—are properly included therein as a different

factual predicate to establish liability under *Monell* than that included in Count I and the Court will not dismiss the failure to train allegations on this basis.[5]

## IV.    CONCLUSION

Accordingly,

**IT IS ORDERED** that Plaintiffs' Motion to Dismiss Defendants' First Amended Complaint (Doc. 48) is **GRANTED IN PART AND DENIED IN PART**. Because Defendants' motion did not argue for dismissal of any of the Plaintiffs' claims that the Policy is unconstitutionally vague, those claims survive the motion to dismiss. Plaintiffs allegations asserting *Monell* liability on a failure-to-train theory also survive the motion. All other claims are dismissed.

Dated this 27th day of August, 2020.

*Michael T. Liburdi*
Michael T. Liburdi
United States District Judge

---

[5] Defendants could be read to argue, however, that because no underlying constitutional violations occurred, the City cannot be liable under *Monell* at all. If that is Defendants' argument, it is largely true. As alluded to above, however, Defendants did not raise any argument to dismiss the Plaintiffs' allegations regarding the vagueness of the Policy until the Reply brief. Therefore, Plaintiff may attempt to establish *Monell* liability premised on the vagueness claim that has survived this motion.